969 So.2d 938 (2007)
Richard Allen JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1972.
Supreme Court of Florida.
July 5, 2007.
Rehearing Denied November 27, 2007.
*943 Carey Haughwout, Public Defender, and Cary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, Leslie T. Campbell and Debra Rescigno, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Richard Allen Johnson appeals from his convictions of first-degree murder, kidnapping, and sexual battery with great force, and his sentence of death for the murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. After considering all issues raised, we affirm the convictions and the sentence of death.

FACTS AND PROCEDURAL HISTORY
The victim in this case is Tammy Hagin. Johnson met Hagin on the evening of February 14, 2001, at a nightclub in Port St. Lucie. After Johnson and Hagin spent several hours together at the club, she accompanied Johnson to a residence he was sharing with others, including Johnson's roommate, John Vitale. Hagin and Johnson had several drinks at the club and left with a bottle of rum Johnson purchased. Hagin's brother and a friend, who were also at the club, followed in another car. Hagin and Johnson began drinking from the bottle on the drive to Johnson's residence. At the house, Johnson and his guests had mixed drinks and played pool for several hours. Hagin's brother and friend left after Johnson assured them he would get Hagin home. In the early morning hours of February 15, Vitale agreed to drive Hagin home to Vero Beach. Johnson, who did not have a driver's license, also went along. Hagin was ambivalent about returning home. The threesome went to Savannas State Preserve, a park where Johnson and Hagin had consensual sex while Vitale waited a short distance away. Afterward, Hagin remained uncertain whether she wanted to go home, so Vitale returned to the house in Port St. Lucie.
There an argument ensued. A neighbor, Catherine Shipp, heard a woman screaming. When Shipp opened her front door a few minutes later, she heard the woman say, "I want to go home. Just let me go." Shipp saw Johnson and Vitale outside the car, holding the car doors to prevent Hagin from exiting. According to Shipp, Hagin ultimately got out of the car. Johnson grabbed her from behind, picked her up, and took her inside the house. The woman kicked her feet, grabbed the door frame, and yelled, "I don't want to go in and clean up."
The commotion involving Hagin awoke other residents in the house where Johnson *944 and Vitale were living. Thomas Beakley shared a bedroom with his girlfriend, Stacy Denigris, next to the bedroom Johnson shared with Vitale. Beakley heard a woman scream and then cry, and awoke Denigris, who left the room to check on the noise. Awakened by Beakley, Denigris heard a girl cry and say that she wanted to go home. Denigris opened the bedroom door to see a woman with brown hair holding onto the door frame of Johnson's bedroom. Johnson grabbed the woman from behind and yanked her into the bedroom. Denigris then saw Vitale in the garage, where the pool table and seating area were located, spoke to him there for a few minutes, and returned to bed.
Vitale, who had agreed to plead guilty to accessory to murder for a twenty-two-year sentencing cap, testified for the State. He stated that Hagin was loudly demanding to go to the bathroom and be taken home at the point when Johnson pulled her into his bedroom on the morning of February 15. The house then became quiet, and Vitale lay on the couch. Johnson eventually emerged from the bedroom and went into the bathroom. Vitale looked into the bedroom and saw that Hagin appeared to be sleeping. Johnson came out of the bathroom, found Vitale in the garage, and told him that Hagin was "gone." Asked what he meant, Johnson said he had broken her neck. Vitale testified that Johnson eventually told him that it takes longer to break someone's neck than he thought, andover defense objectionthat Hagin said as she was being strangled that she wanted to see her children.
Acting together, Johnson and Vitale wrapped Hagin's body in a deflated air mattress and placed it in the trunk of Vitale's car. The two men attempted to enlist the help of Johnson's friend, Shane Bien, in disposing of the body at sea. Bien allowed Johnson to call boat rental businesses and gave Johnson a fishing pole so it would appear they were fishing as they disposed of the body. According to Bien, Johnson said he'd killed a woman who was "the most annoying person he had ever met" and who "had tried to stab him with an object." Johnson showed Bien the outline of a body wrapped in an air mattress in the trunk of Vitale's car.
Using money from Hagin's purse, Johnson and Vitale purchased a large cooler, concrete blocks, a chain, and a padlock. They returned to the Savannas State Preserve, where they submerged the body in several feet of water. A fisherman discovered the body three days later.
Medical examiner Charles Diggs testified that Hagin died of strangulation in which the killer used both a ligature and a bare hand. Diggs testified that a strangulation victim starts to lose consciousness within fifteen to thirty seconds and that death occurs within three to four minutes. Hagin also had a superficial premortem cut on her scalp that was consistent with a knife wound, and bruises on her forehead and chin. There was also a postmortem laceration of her perineum, including the uterus, bladder, and vulva. Diggs could not rule out marine life as the cause of the damage to the perineum, although he said that marine animals will usually attack more than one area of the body. No semen was discovered in what remained of Hagin's vagina or uterus. Her blood alcohol level was .186, of which .04 to .06 could have been the result of decomposition.
Johnson and Vitale were both arrested within days of the discovery of Hagin's body. Vitale, questioned first, incriminated Johnson. Confronted with Vitale's statement, Johnson stated that he was drunk and lost his mind when Hagin was killed. He then said that he and Hagin were having sex and she was not fighting him, but "I put my hand on her neck and *945 she died." Asked when he realized she was dead, he stated, "When we stopped having sex, when I got up and I said get up, and she didn't get up." Johnson adamantly denied mutilating Hagin's body.
Testifying in his own behalf at trial, Johnson stated that Vitale, who acknowledged at trial that he is gay and admitted being in love with Johnson, argued with Hagin throughout the evening and morning of February 14-15. When Johnson, Hagin, and Vitale ultimately returned to the house after their trip to the Savannas park, all three were arguing. Johnson grabbed her to calm her down and pulled her into the room to keep from disturbing others sleeping in the house. He said that he and Hagin then had consensual sex and he passed out for about an hour, discovering she was dead only when he awoke. Johnson said that in his statement to police, he meant that he had placed his hand in the area of her neck during sex, but did not choke or kill her. He explained that when he said he lost control, he meant that he lost control of the alcohol, stating, "I couldn't control how I was spinning, how I was standing." He also stated that he meant that he discovered she was dead after he had passed out, not immediately after sex.
Johnson further testified that after learning Hagin was dead, he found and told Vitale. Johnson testified that Vitale responded by saying "you killed her," and discouraged him from calling the police. Johnson believed that he had killed Hagin until he read Vitale's statement, particularly Vitale's assertion that Johnson stated he broke Hagin's neck, which Johnson stated was false. Johnson testified that he eventually came to believe that Vitale had killed Hagin.
The jury found Johnson guilty of first-degree murder and concluded in an interrogatory verdict that its finding of guilt was based on both premeditated murder and felony murder. The jury also found Johnson guilty of kidnapping, sexual battery with great force, and theft of less than $300.
During the penalty phase, the trial court instructed the jury on three aggravating factorsthat the murder was committed while Johnson was on felony community control, that the murder was committed during the commission of a sexual battery or kidnapping or both, and that the killing was especially heinous, atrocious, or cruel (HAC). The jury was instructed on the statutory mitigating factors that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, and that the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. The jury also received instructions on numerous nonstatutory mitigators. By a vote of eleven to one, the jury recommended the death penalty.
At sentencing, the court found the same three aggravators on which the jury had been instructed, giving moderate weight to the community control aggravator and great weight to the others. The court rejected the two mental statutory mitigating circumstances and the age mitigator. The trial court found the statutory mitigator of no significant history of criminal activity, giving it moderate weight. The court found seven nonstatutory mitigators.[1] Finding that the aggravators outweighed *946 the mitigators, the court sentenced Johnson to death for the murder and imposed consecutive sentences of thirty years for the kidnapping, life for the sexual battery, and sixty days for petit theft.
Johnson asserts the following errors: (1) grant of a challenge for cause to a potential juror over defense objection; (2) admission of a statement by the victim while she was being strangled; (3) allowing the State to proceed on a robbery count charged by information rather than indictment; (4) improper cross-examination of the defendant; (5) sufficiency of the evidence of kidnapping, sexual battery, and felony murder; (6) proportionality of the death sentence; (7) imposition of a death sentence after the defendant rejected a plea bargain for a sentence of life imprisonment; and (8) application of the HAC aggravator. We separately address each claim below. Johnson also raises six issues concerning the constitutionality of Florida's capital sentencing laws and procedures, which we address summarily under a single heading.

ANALYSIS

I. Grant of Cause Challenge
In his first issue, Johnson asserts that the trial court committed reversible error in excusing juror Grace Monforte for cause after she voiced doubt over her ability to recommend a sentence of death. After reviewing Monforte's responses during voir dire, we conclude that the trial court acted within its discretion in granting the challenge for cause.
The validity of a cause challenge is a mixed question of law and fact, on which a trial court's ruling will be overturned only for "manifest error." Fernandez v. State, 730 So.2d 277, 281 (Fla.1999). "Manifest error" is tantamount to an abuse of discretion. See Kimbrough v. State, 700 So.2d 634, 638-39 (Fla.1997) (stating that court's determination of juror's competency "will not be overturned absent manifest error" and concluding that trial court did not abuse its discretion in excusing a juror for cause). "The trial judge has the duty to decide if a challenge for cause is proper, and this Court must give deference to the judge's determination of a prospective juror's qualifications." Castro v. State, 644 So.2d 987, 989 (Fla.1994) (citing Wainwright v. Witt, 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).
A potential juror may be excused "for cause" if the juror has a state of mind regarding the case "that will prevent the juror from acting with impartiality." § 913.03(10), Fla. Stat. (2006). In a capital case, this standard is met if a juror's views on the death penalty "prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath." Fernandez, 730 So.2d at 281. "A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." Ault v. State, 866 So.2d 674, 683 (Fla.2003).
Monforte gave a range of responses to questions concerning the death penalty on voir dire. As did the trial court, we consider these responses in their totality. Cf. Franqui v. State, 804 So.2d 1185, 1192 (Fla.2001) (relying on "vacillation throughout voir dire" in reviewing grant of cause challenge); see also Meade v. State, 867 So.2d 1215, 1216 (Fla. 3d DCA 2004) (reviewing *947 grant of cause challenge "based on the totality of the juror's responses").
When first asked by the State about her views on the death penalty, Monforte stated: "I don't say I don't believe in the death penalty, but I would choose it as a very very last resort." She elaborated:
I don't know, don't agree with it, I don't agree that it should be applied to everything, even though I feel that everybody has the right to live and if a person takes another's life, they should pay for their consequences, their actions, but the death penalty, I would have some doubt myself.
MR. SEYMOUR: Okay. Are you doubting your ability to vote for the death penalty?
GRACE MONFORTE: Yes, I'm doubting my ability that I could. I don't believe in it but could I bring myself to not vote for it, no. If it needed to be that way then, yes, I could vote for it. I don't like it, I don't agree with it.
MR. SEYMOUR: Okay. Let's take this one step further. The law is going to provide, as I said, the definition of aggravators, mitigators, you weigh the two, assuming that the state has proved one aggravator, one or more, then you weigh those and you come out with what should be an appropriate recommendation in this case. That may disagree with the way you feel. You may sit there and say, the law says I should vote for this, but I just don't like it and I don't want to do it in this case and this is not one of the cases I would define as calling for the death penalty, could you subordinate your own feelings and vote for the death penalty in this case or are your personal feelings so strong you just wouldn't be able to?
GRACE MONFORTE: I down [sic] know. I can't give you a yes or no answer.
Monforte later responded affirmatively when the prosecutor stated that her prior answers indicated she was unsure of her attitude about the death penalty and her ability to vote for it. Subsequently, she told defense counsel that she could weigh the sentencing circumstances and would vote for the death penalty as a last resort.
Finally, Monforte had the following exchange with the prosecutor:
MR. SEYMOUR: . . . Ms. Monforte, kind of did this earlier today, I think you told us that you really don't like the death penalty?
GRACE MONFORTE: Correct.
MR. SEYMOUR: And you really wouldn't like to vote for it?
GRACE MONFORTE: Correct.
MR. SEYMOUR: I think I asked you earlier whether your ability [sic] about the death penalty would substantially impair your ability to follow the law in that regard and to vote for it if it were required?
GRACE MONFORTE: I would definitely follow the law if asked to, but it's not something I like to do. I would not  I would like to follow the law, I would not like to give that decision.
The trial court concluded that the "entire sequence of her comments and statements" during voir dire provided sufficient grounds to grant the challenge for cause. We find no error in the trial court's ruling.
A potential juror's initial response to questioning about the death penalty alone will not automatically provide good cause for excusal if subsequent responses alleviate doubt on the juror's ability to impartially render an advisory verdict. However, a juror who gives "consistently equivocal voir dire answers" on his or her ability to recommend death is subject to a challenge for cause. Conde v. *948 State, 860 So.2d 930, 942-43 (Fla.2003). In Conde, we rejected a claim that the trial court erred in granting a cause challenge against a juror whose equivocal responses evinced what the trial court termed "deep doubt" about her ability to serve in a death penalty case. Id. Similarly, in Franqui, this Court found no abuse of discretion in excusing for cause jurors who vacillated or gave equivocal responses on whether they could recommend the death penalty. Franqui, 804 So.2d at 1192; cf. Fernandez, 730 So.2d at 281 (concluding that challenge to grant of cause challenge would have no merit even if it had been preserved because "[t]he four prospective jurors to whom appellant points gave equivocal responses to questions from the prosecutor, defense counsel, and the court as to whether they could follow the law and set aside their beliefs concerning the death penalty"); Bryant v. State, 656 So.2d 426, 428 (Fla.1995) (concluding that trial court erred in denying a cause challenge against a death penalty supporter who said he could follow the court's instructions but gave other responses "sufficiently equivocal to cast doubt on this").
Persistent equivocation or vacillation by a potential juror on whether he or she can set aside biases or misgivings concerning the death penalty in a capital penalty phase supplies the reasonable doubt as to the juror's impartiality which justifies dismissal. In their totality, Monforte's responses indicated a state of mind concerning the death penalty that would have substantially impaired her ability to perform her duties as a juror. Therefore, the trial court did not err in excusing her for cause on grounds that she lacked the qualifications necessary to serve as a juror in a capital case.

II. Admission of Victim's Statement During Killing
During the third round of direct examination of state witness Vitale, the trial court admitted testimony that Johnson told Vitale that "[w]hen he was choking her she said she wanted her children." The defense objected on grounds that the testimony went beyond the permissible scope of redirect examination, that the statement had little or no probative value and tremendous potential for unfair prejudice, and that it did not meet the criteria for either a dying declaration or an excited utterance. The trial court overruled the objection on the first of these grounds because the State could have excused Vitale and recalled him to the witness stand solely to elicit the statement. The court further concluded that the statement fell within the exception to the hearsay rule for excited utterances, which is contained in section 90.803(2), Florida Statutes (2006).[2] The court also acknowledged that the statement was "extremely damaging," but applying the test of admissibility in section 90.403, Florida Statutes (2006), concluded that its potential for unfair prejudice did not substantially outweigh its probative value on the issue of premeditation.
Johnson reiterates each of his grounds for objection on appeal. We conclude that he has not demonstrated reversible error as to either his first-degree murder conviction or death sentence.
*949 This Court reviews evidentiary rulings for abuse of discretion. A judge's discretion is limited by the rules of evidence, Johnston v. State, 863 So.2d 271, 278 (Fla.2003), and by the principles of stare decisis. Cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) ("Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic nor reasonableness."). A trial court ruling constitutes an abuse of discretion if it is based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).
Initially, we reject Johnson's claim that the question eliciting the remark went beyond the permissible scope of redirect examination. As the trial judge concluded, the State could have recalled Vitale to the stand and elicited the statement in a new direct examination. See § 90.612(1)(b), Fla. Stat. (2006) (providing that judge "shall exercise reasonable control over the mode and order of the interrogation of witnesses . . . so as to [a]void needless consumption of time"). Because the trial court acted within its discretion to permit the testimony while Vitale was still on the witness stand, we need not decide whether the question exceeded the permissible scope of redirect.
Before determining whether the statement falls within the exception to the hearsay rule for excited utterances, we note that the statement is not rendered inadmissible merely because it passed through two declarants. Vitale's testimony contained two levels of hearsayHagin to Johnson and Johnson to Vitale. Hearsay within hearsay is admissible if each part of the statement falls within an exception to the hearsay rule. § 90.805, Fla. Stat. (2006). Johnson's statement to Vitale falls under the party admission exception to the hearsay rule in section 90.803(18)(a), Florida Statutes (2006). The next step is to determine whether Hagin's statement to Johnson was admissible under an exception to the hearsay rule.[3]
The excited utterance exception authorizes admission of hearsay containing "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." § 90.803(2), Fla. Stat. A statement is an excited utterance under section 90.803(2) if it was made (1) regarding an event startling enough to cause nervous excitement, (2) before there was time to contrive or misrepresent, and (3) while the person was under the stress or excitement caused by the event. Henyard v. State, 689 So.2d 239, 251 (Fla.1996).
Although Johnson challenges admission of the statement under section 90.803(2), he does not dispute that the statement was made while the declarant was under the stress of an event startling enough to cause nervous excitement. Indeed, we have observed "[i]f the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement." State v. Jano, 524 So.2d 660, 662 (Fla.1988) (quoting Edward W. Cleary, McCormick on Evidence § 297, at 856 (3d ed.1984)). Hagin was clearly under the stress of her strangulation when she spoke of her children. Johnson argues instead that the requirement that the statement relate to the startling event or condition means that it must "describe or say something about" *950 the event or condition. Johnson further contends that the statement itself demonstrates reflection that cannot be reconciled with the rationale for the exception: that a person affected by the excitement of a startling event lacks "the reflective capacity necessary for conscious misrepresentation." Rogers v. State, 660 So.2d 237, 240 (Fla.1995) (citing Charles W. Ehrhardt, Florida Evidence § 803.2 (1994 ed.)).
We disagree with both contentions. First, a statement need not describe or refer to the exciting event to qualify as an excited utterance. The exception for spontaneous statements in section 90.803(1) is limited to statements "describing or explaining an event or condition," but section 90.803(2) more broadly encompasses statements "relating to a startling event or condition." (Emphases supplied.) Rejecting an argument that confused the spontaneous statement and excited utterance exceptions, the Third District ruled that in a trial for DUI causing injury and property damage, the trial court correctly admitted hearsay statements by a distraught woman at an accident scene that she and the defendant were at a party, and that "[h]e was drunk and we told him not to drive." Edwards v. State, 763 So.2d 549, 550 (Fla. 3d DCA 2000). The Third District concluded that the woman's statement "sufficiently `relates' to the event causing the excitement, namely, the serious automobile accident." Id. In this case, Hagin's statement as she was being strangled also sufficiently relates to the startling event, her strangulation, to satisfy this criterion of section 90.803(2).
We also conclude that Hagin's statement did not show reflection demonstrating a capacity for conscious misrepresentation that precludes admission as an excited utterance. The medical examiner in this case testified that a strangulation victim loses consciousness generally within fifteen to thirty seconds, up to one minute at most. Therefore, according to the evidence, Hagin's statement about her children would have been made within a one-minute window while she remained conscious during the lethal attack. "[W]here the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." Rogers, 660 So.2d at 240 (quoting Jano, 524 So.2d at 662). Here, the statement was contemporaneous with the startling event, and neither the statement itself nor the circumstances in which it was made indicate the type of reflective thought that could result in fabrication.[4] In sum, the statement meets each of the criteria for an excited utterance under section 90.803(2).
Johnson next asserts that Hagin's statement to Johnson was inadmissible because it did not tend to prove premeditation and that any probative value it carried was substantially outweighed by unfair prejudice. The trial court concluded that the evidence was relevant and admissible to show that Johnson killed out of premeditation. We agree that because the defendant related the statement and said it was made while he was choking the victim, it was relevant in the guilt phase to establish the element of premeditation for first-degree murder.
Evidence tending to prove or disprove a material fact is admissible except as provided by law. §§ 90.401-90.402, Fla. Stat. (2006). Section 90.403 provides for the exclusion of evidence if its probative value is "substantially outweighed" by any *951 of several considerations, including the danger of unfair prejudice. As with evidentiary determinations in general, this Court applies an abuse of discretion standard to a trial court's application of the unfair prejudice test of section 90.403. Floyd v. State, 913 So.2d 564, 574 (Fla. 2005). Pertinent considerations include the need for the evidence, the tendency of the evidence to suggest an emotional basis for the verdict, the chain of inference from the evidence necessary to establish the material fact, and the effectiveness of a limiting instruction. Taylor v. State, 855 So.2d 1, 22 (Fla.2003) (quoting State v. McClain, 525 So.2d 420, 422 (Fla.1988)).
Generally, a victim's statement cannot be used to prove the defendant's state of mind. See Stoll v. State, 762 So.2d 870, 874 (Fla.2000); Downs v. State, 574 So.2d 1095, 1098 (Fla.1991); Correll v. State, 523 So.2d 562, 565 (Fla.1988). Each of these cases concerned a statement by a victim to a third person expressing fear of the defendant before a murder, which we ruled inadmissible under the state of mind exception to the hearsay rule contained in section 90.803(3). This case is different in that it was the defendant who heard and related what the victim said while he was strangling her. Although we could locate no precedent directly on point, we have reviewed cases in which a defendant's statement to a third person that the victim begged for his or her life was introduced during the guilt phase and then relied upon by the sentencing judge to demonstrate that the killing was either cold, calculated, and premeditated (CCP) or HAC. See England v. State, 940 So.2d 389, 395, 402 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1916, 167 L.Ed.2d 571 (2007); Anderson v. State, 863 So.2d 169, 177 (Fla. 2003); Kokal v. State, 492 So.2d 1317, 1319 (Fla.1986); Deaton v. State, 480 So.2d 1279, 1282 (Fla.1985).
Just as the commission of a killing after a victim has begged to be spared can contribute to the heightened premeditation necessary for CCP, this type of evidence is relevant to the issue of premeditation in the guilt phase of a first-degree murder trial. Premeditation can be inferred from circumstantial evidence such as "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Sochor v. State, 619 So.2d 285, 288 (Fla.1993) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). Applying the test of relevance from section 90.401 as the tendency to prove or disprove a material fact, premeditation can also be inferred from evidence that the defendant persisted in strangling a victim who asked for his or her children. The jury could have concluded from the circumstances under which the statement was made that Johnson was aware of the consequences of his actions in strangling Hagin and therefore had the opportunity for reflection that is essential to first-degree, premeditated murder. See Fla. Std. Jury Instr. (Crim.) 7.2 (stating that the period of time necessary to form a premeditated intent to kill "must be long enough to allow reflection by the defendant"); see also Sochor, 619 So.2d at 288 ("[Premeditation] must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it in so far as the life of his victim is concerned.").
Regarding the need for the evidence, the statement was not merely cumulative of other evidence of premeditated murder. Although the circumstances of the killing and other statements attributed to Johnson were sufficient to prove both premeditated *952 and felony murder, the jury could conceivably have construed this evidence as proof beyond a reasonable doubt of only second-degree murder or manslaughter. For example, the State presented evidence of a heated argument between Johnson and Hagin, both of whom were intoxicated and had engaged in consensual sexual intercourse. In addition, Johnson told his friend Shane Bien that Hagin attempted to stab him with an object and was "the most annoying person that he ever met." The jury could have concluded from this evidence that Johnson acted not from premeditation but from a depraved mind regardless of human life or in the heat of passion, which would make the killing second-degree murder or manslaughter. Cf. Douglas v. State, 652 So.2d 887, 890 (Fla. 4th DCA 1995) ("[A] jury can find a defendant who has killed in the heat of passion guilty of either second degree murder or manslaughter. . . .") (citing Forehand v. State, 126 Fla. 464, 171 So. 241 (1936)).
Having concluded that the evidence was relevant, we next review the trial court's determination under section 90.403 that its probative value was not substantially outweighed by its potential for unfair prejudice. We acknowledge the statement's potential to create an emotional basis for the verdict. However, the prejudicial impact of the evidence could have been ameliorated to some extent by an instruction to consider the evidence solely on the issue of the defendant's intent. Johnson complains on appeal that the trial court did not give a limiting instruction, but he made no request for such an instruction below and does not now claim that a limiting instruction would have been ineffective. Therefore, this aspect of his argument is waived. Further, we note that the State was cautious in its use of the statement. The prosecutor did not mention the statement again until the penalty phase, when he legitimately argued that it supported the HAC aggravator.
Accordingly, the potential for unfair prejudice in Hagin's statement that she wanted her children did not "substantially outweigh" the statement's probative value. We conclude that the trial court acted within its discretion under the rules of evidence, specifically sections 90.403 and 90.803(2), in allowing the State to introduce the statement over defense objection.[5] Because we find no error, we also reject Johnson's argument that admission of the statement was independently harmful as to the penalty phase.

III. Substitution of Robbery Count Charged in Information
Johnson was indicted for first-degree murder, kidnapping, sexual battery and third-degree grand theft. Subsequently, the State moved to consolidate the indictment with an information it had filed charging Johnson with robbery. In a hearing on the motion, defense counsel did not object to consolidation. The State noted that the grand theft count would be nolle prossed and become a lesser-included offense of robbery. During jury selection, the judge read to the jury an "indictment" containing all the charges, including robbery. The jury ultimately found Johnson guilty of first-degree murder via both premeditation and felony murder, guilty of both sexual battery and kidnapping as charged, and guilty of theft of less than $300 as a lesser included offense of robbery. Although he did not object below, *953 Johnson now argues that in substituting a count of robbery filed by information for the grand theft count charged by indictment, the State invalidated the entire indictment and deprived the trial court of jurisdiction to try him on any of the counts charged. This claim is without merit.
A capital crime may be charged only by indictment, but any other felony may be charged by either information or indictment. Art. I, § 15, Fla. Const.; Fla. R.Crim. P. 3.140(a). An indictment may be amended only to correct a defect, error, or omission in a caption or to eliminate surplusage. Fla. R.Crim. P. 3.140(c)(1), (i)(j). Otherwise, a trial court has no authority to issue an order amending an indictment. Snipes v. State, 733 So.2d 1000, 1004 (Fla.1999). Further, once an indictment has been returned, a grand jury cannot charge a new or different crime through an amendment to the indictment. Smith v. State, 424 So.2d 726, 729 (Fla.1982). However, the grand jury and state attorney have concurrent authority to charge noncapital crimes. State ex rel. Hardy v. Blount, 261 So.2d 172, 174 (Fla.1972). Even when the grand jury has declined to charge an offense by indictment, the state attorney may charge the same offense by information. Id.; State ex rel. Latour v. Stone, 135 Fla. 816, 185 So. 729, 730 (1939).
In Latour, a grand jury investigated the conduct of a city official but did not issue an indictment. The state attorney then charged the official by information with malpractice in office. This Court denied the defendant's petition for a writ of habeas corpus challenging the order to take him into custody. Citing the predecessor to article I, section 15(a), the Court stated:
By this amendment the grand jury and the prosecuting attorney were granted concurrent authority to file a formal accusation of the commission of a felony not involving capital punishment by indictment or information, respectively. There is some authority to the contrary, but we think the more logical rule is that the prosecuting officer having jurisdiction is authorized to file an information even though the grand jury may have failed or refused to find an indictment.
Id.
As in Latour, the State's method of charging robbery in this case is permissible because it concerned a noncapital crime. The State did not amend the indictment; instead, it dismissed a count charging grand theft and filed an information charging robbery based on the same conduct. The only actual change to the indictment was to dismiss a noncapital count that did not have to be charged by indictment in the first place. The state attorney's concurrent authority permitted charging the count by information.
The case Johnson relies on to support his assertion of a jurisdictional defect, Akins v. State, 691 So.2d 587 (Fla. 1st DCA 1997), is not on point. In that case, the court accepted a guilty plea to attempted first-degree felony murder. Before Akins was sentenced, this Court determined in another case that the offense was nonexistent. Seeking to preserve the plea agreement, the parties jointly stipulated at sentencing to substitute attempted first-degree premeditated murder for attempted felony murder. Id. at 588. On appeal, Akins challenged the stipulation as an ineffectual amendment to the indictment. The First District agreed:
The trial court . . . lacked jurisdiction to sentence appellant for attempted first-degree felony murder because this offense was no longer a crime at the time he was sentenced, and the court lacked jurisdiction to sentence appellant for attempted premeditated murder because *954 an indictment cannot be amended by stipulation of the parties. An "invited error" analysis is inapplicable in the instant case because jurisdiction cannot be conferred on the court by agreement of the parties.
Id. at 588-89. The indictment here was not actually amended, either by stipulation or otherwise, avoiding the jurisdictional pitfall in Akins. The trial court in this case therefore had jurisdiction over both the remaining counts in the indictment prosecuted by the State and the robbery count charged in the information.

IV. Cross-Examination of Defendant
Johnson asserts that the trial court erred in permitting the State to ask him improper questions on cross-examination. Specifically, he claims that the prosecutor used cross-examination to reiterate the testimony of State witnesses Thomas Beakley, who was awakened by Hagin's voice on the morning of the murder, and Stacy Denigris, who saw Johnson pull Hagin into his bedroom shortly before she was killed. Johnson also asserts that the State improperly asked Johnson if the testimony of one of these witnesses was truthful.
Initially, this issue is not preserved, because the grounds for reversal argued on appeal are not the same as those raised in the objection below. Johnson's counsel objected on grounds that the prosecutor prevented Johnson from answering the State's questions and that the questioning was repetitive. He makes different arguments on appeal. An argument is preserved for appeal only if the same argument was made below. Reynolds v. State, 934 So.2d 1128, 1140 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982).
Further, even if the issue were preserved, we would conclude there is no reversible error. First, the prosecutor's reiteration of portions of the testimony of Beakley and Denigris was a proper predicate to asking Johnson if his account and theirs could be reconciled. A witness's credibility may be attacked via testimony presenting a different view of the facts by other witnesses. § 90.608(5), Fla. Stat. (2006). Responding to the prosecutor's questions concerning the differences in testimony, Johnson pointed out areas where he disagreed with the State's characterization of the other witnesses' testimony and areas where his recollection differed from those of the witnesses. This was proper cross-examination.
However, the prosecutor did cross the line into impermissible cross-examination in twice asking Johnson whether Beakley was truthful when he said that Hagin was crying.
[A]llowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury to determine a witness's credibility. Second, although the fact that two witnesses disagree does not necessarily establish that one is lying, such questioning may lead the jury to conclude that the witness being questioned is actually lying. Finally, unless there is evidence that the witness is privy to the thought processes of the other witness, the witness is not competent to testify concerning the other's state of mind.
Knowles v. State, 632 So.2d 62, 65-66 (Fla. 1993). In Knowles, the State improperly asked the defendant whether two State witnesses were lying. Id. at 65. Here, the prosecutor's question of Johnson as to whether Beakley was truthful conveys the same improper message: that the witness being questioned is actually lying.
*955 Despite the improper questioning, any error in overruling an objection on the grounds now argued would have been harmless. Johnson responded to the questioning without stating that he thought Beakley was untruthful. In each instance, the question concerned only whether Hagin was crying or whining. Johnson parried the prosecutor's suggestion that either he or Beakley had to be lying by asserting that what Beakley heard as a cry, Johnson heard as a whine. There is no reasonable possibility that this exchange so affected the jury's view of Johnson's credibility that it contributed to the verdict. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986) (defining test of harmless error as whether appellate court can conclude beyond a reasonable doubt that the error did not affect the verdict). For the same reason, the questions do not cross the higher threshold of fundamental error, which can be raised even if unpreserved because it "goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process." J.B. v. State, 705 So.2d 1376, 1378 (Fla.1998).

V. Sufficiency of Evidence on Underlying Felonies
Johnson next asserts that the evidence was legally insufficient to prove either kidnapping or sexual battery, and therefore also insufficient to prove felony murder. We conclude that the State presented sufficient evidence to support the verdict on both the underlying felonies and first-degree felony murder.
The denial of a motion for a judgment of acquittal will be affirmed if there is competent, substantial evidence on each element of the crime. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). This determination is made "after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal." Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981). Where the evidence of guilt is wholly circumstantial, the evidence is legally sufficient only if it is inconsistent with any reasonable hypothesis of innocence. Darling v. State, 808 So.2d 145, 155 (Fla.2002). Here, the evidence of kidnapping rests on eyewitness testimony but the evidence of sexual battery is arguably circumstantial because the crime occurred in private and Johnson told police and testified that after he pulled Hagin into his bedroom, she began making sexual advances and then engaged in consensual sex.
Kidnapping requires proof of both confinement and criminal intent underlying the confinement:
The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
1. Hold for ransom or reward or as a shield or hostage.
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.
4. Interfere with the performance of any governmental or political function.
§ 787.01(1)(a), Fla. Stat. (2006). Johnson asserts that evidence of criminal intent was insufficient. The State maintains that it presented competent, substantial evidence that the confinement was with intent to inflict bodily harm or commit or facilitate commission of a sexual battery. We agree with the State.
The evidence was sufficient to reach the jury on the element of intent to inflict bodily harm essential to kidnapping. Hagin was killed between the time that housemate Denigris saw Johnson yank or pull *956 her into his room against her will and the time that Johnson emerged from the room, about an hour later. According to medical examiner Charles Diggs, in addition to the strangulation marks on her neck, Hagin suffered a premortem cut wound from a knife-like object above her left ear and contusions to her forehead and chin. These injuries, inflicted during Johnson's forcible confinement of Hagin, constitute competent, substantial evidence that the confinement was with intent to inflict bodily harm. See Thomas v. State, 894 So.2d 126, 131-32, 134-35 (Fla.2004) (holding that a combination of direct eyewitness testimony, the defendant's confession, and circumstantial evidence that defendant continued to confine victim while intending to inflict harm because she was eventually sexually assaulted and murdered was sufficient to support a conviction of kidnapping and first-degree murder), cert. denied, 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005); cf. Crain v. State, 894 So.2d 59, 74-75 (Fla.2004) (relying on physical and forensic evidence and disparity of size and strength between defendant and victim to find sufficient evidence of intent to harm during abduction).
The circumstantial evidence of sexual battery was also legally sufficient to contradict Johnson's hypothesis of consensual sex and thereby enable the jury to find intent to commit or facilitate commission of a felony. "Although the reasonableness of a hypothesis of innocence is a jury question, it is the court's duty to determine whether the state has been able to produce sufficient, competent evidence to contradict the defendant's story." Cochran v. State, 547 So.2d 928, 937 (Fla. 1989). Hagin's resistance to entering the bedroom, the evidence of manual and ligature strangulation, the request for her children, and the premortem wounds to her head, including one made by a knife-like object, were sufficient to permit the jury to reject Johnson's hypothesis. Cf. Fitzpatrick v. State, 900 So.2d 495, 509 (Fla. 2005) (relying on trauma to murder victim's breasts, puffiness around head, bruising on arms, scratches covering legs, and cigarette burn to leg as sufficient to reject defendant's assertion that sex was consensual); Zack v. State, 753 So.2d 9, 18 (Fla. 2000) (determining that although "there is evidence from which a jury could conclude that [the victim] originally intended to engage in consensual intercourse with [the defendant], such evidence does not negate" a finding to the contrary).
Accordingly, the trial court did not err in denying the motion for judgment of acquittal on kidnapping or sexual battery, or first-degree felony murder based on these offenses.[6]

VI. Sufficiency of Evidence on HAC Aggravator
Johnson argues that the evidence is insufficient to support the trial court's determination that the murder was especially heinous, atrocious, or cruel (HAC). We find no error.
Aggravating circumstances require proof beyond a reasonable doubt. *957 Hernandez-Alberto v. State, 889 So.2d 721, 733 (Fla.2004). When a defendant asserts that the evidence is insufficient to support an aggravator, this Court reviews the record to determine whether the trial court applied the right rule of law for the aggravator, and, if so, whether competent, substantial evidence supports its finding. Willacy v. State, 696 So.2d 693, 695 (Fla. 1997).
In concluding that the murder was HAC, the trial court relied on the medical examiner's testimony that the murder was committed by both manual and ligature strangulation, and that a strangulation victim starts to lose consciousness within fifteen to twenty seconds of the start of the attack. The court also found:
The evidence shows in this case that Richard used a bear hug to carry Tammy into the house against her will and he later pulled her from behind into his bedroom before her death. There was a painful cut to her head before she died, and she was struck about the head before her death with sufficient force to cause bruising. There is evidence she knew she was about to be killed because she asked to see her children. Richard Johnson made the statement that it was harder to break her neck than he thought. Richard told his best friend the morning after the murder that Tammy was the most annoying woman he had ever met. The jury found Richard guilty of Sexual Battery Using Great Force.
The Court finds beyond a reasonable doubt that the State has proven this aggravating circumstance, and that Tammy Hagin experienced extreme terror, agony, and pain before her death. Her murder was unnecessarily torturous, conscienceless, and pitiless.
The trial court applied the correct rule of law in finding that this aggravator exists when a conscious victim is strangled. This Court has consistently upheld the HAC aggravator for strangulation of a conscious victim. See Huggins v. State, 889 So.2d 743, 770 (Fla.2004); Conde, 860 So.2d at 955; Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002).
Competent, substantial evidence supports the trial court's determination that Hagin was conscious when strangled. Although intoxicated, she was clearly conscious and alert when Johnson pulled her into his bedroom. As in Huggins, in which this Court upheld the HAC aggravator for a strangulation murder, there is no evidence that the victim was unconscious when she was strangled. In fact, the evidence is to the contrary. During the guilt phase, the State introduced Johnson's pretrial statement that Hagin stated as she was being strangled that she wanted to see her children, which not only demonstrates that she was conscious but constitutes direct evidence of foreknowledge of death, which is one of the hallmarks of HAC. See Barnhill, 834 So.2d at 850 ("Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.").
Accordingly, the trial court did not err in finding that the murder was especially heinous, atrocious, or cruel.

VII. Proportionality of Death Sentence
We next address Johnson's assertion that the death penalty is a disproportionate punishment in his case in comparison to other cases in which death penalties were reduced on proportionality grounds. The State contends that death is proportionate for a murder by a strangulation given the three aggravators and minor mitigation. We conclude that death is proportionate in this case.
*958 Proportionality review of death sentences derives in part from due process considerations that flow from the nature of this "uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. . . . Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law." Urbin v. State, 714 So.2d 411, 417 (Fla.1998) (quoting Tillman v. State, 591 So.2d 167, 169 (Fla.1991)). Proportionality review is a consideration of the totality of the circumstances in a case in comparison with other capital cases. Sliney v. State, 699 So.2d 662, 672 (Fla.1997); Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Urbin, 714 So.2d at 416.
The trial court in this case found three aggravating circumstances: (1) the defendant committed the murder during a kidnapping and sexual battery; (2) the murder was committed while the defendant was on community control for a felony; and (3) the murder was especially heinous, atrocious, or cruel.
The first of these aggravators rests on jury verdicts finding Johnson guilty of kidnapping and sexual battery using great force, and on the jury's answer to an interrogatory reflecting that its first-degree murder verdict rests on both premeditated murder and felony murder. The kidnapping consisted of the defendant forcing Hagin first into the house where he was living and then into his bedroom. In doing so, he ignored her protests that she wanted to go home and her physical resistance. The sexual battery with great force is supported by evidence that Johnson admitted having sex in which he placed his hands on Hagin's neck and on premortem injuries to her head, including a contusion and a laceration from a knife-like object. Qualitatively, this is a strong aggravating circumstance, reflected in the great weight assigned to it by the trial court. It is supported by two violent felonies, both of which were still underway at the time of the murder. Neither violent felony was essential to the murder verdict, which was also supported by a jury finding of premeditation.
The second aggravator rests on the defendant's status as a community controllee at the time of the murder. Under section 921.141(5)(a), Florida Statutes (2006), this aggravator applies to a defendant on community control when the killing occurred. Johnson's community control officer testified that at the time of the murder, Johnson was in violation of several conditions of community control, and that in going to a nightclub and other locations on the night and morning of the murder, he was in violation of his curfew and the requirement that he remain at his residence except for a half-hour before and after work. The trial court gave this aggravator moderate weight.
The third aggravator, HAC, is among the weightiest in the statutory scheme. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999). It "applies in physically and mentally torturous murders which can be exemplified by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Barnhill, 834 So.2d at 849. Reflecting the evidence at trial, the trial court stated in its sentencing order that Hagin suffered "a painful cut to her head before she died, and she was struck about the head before her death with sufficient force to cause bruising. There is evidence she knew she was about to be killed because she asked to see her children." In support of this aggravator, the medical examiner testified *959 that a strangulation victim loses consciousness within fifteen to thirty seconds, up to a minute in some cases. Johnson's statements to Vitale that it takes longer than he expected to break someone's neck and that Hagin asked for her children reflects that she was conscious for some portion of the attack. The gravity of this aggravator is magnified by its congruence with the aggravator of murder during a sexual battery: Hagin was killed in an especially heinous, atrocious, or cruel manner while she was being raped.
The only statutory mitigator found by the trial court was that Johnson had no significant history of prior criminal activity. The trial court assigned this mitigator moderate weight. Although the trial court declined to find the "extreme mental or emotional disturbance" or "substantially impaired capacity" statutory mitigators, it did find and give some weight to nonstatutory mitigation that Johnson suffered physical and emotional abuse by his father and sexual abuse by other family members. The evidence supporting these mitigators demonstrates a deplorable childhood.[7] The trial court also found and gave moderate weight to nonstatutory mitigation that Johnson had an extensive history of drug and alcohol abuse and was "under the influence of an excessive amount of alcohol" at the time of the murder.
We conclude that in comparison with analogous cases in which this Court ruled that death was a proportionate penalty, the sentence here is not constitutionally disproportionate. We rely primarily on Douglas v. State, 878 So.2d 1246 (Fla. 2004), and Orme v. State, 677 So.2d 258 (Fla.1996). In Douglas, the aggravators were HAC and murder committed during a sexual battery, balanced against a mitigator of no prior criminal history that was given little weight based on the defendant's drug activity. 878 So.2d at 1262. There was less background mitigation than in this case:
[A]lthough there was testimony that Douglas had trouble reading and was diagnosed with learning disabilities in the second grade, there was no evidence as to how or whether these learning disabilities affected him at or about the time of the murder. Further, no evidence was presented that Douglas suffered from any mental or emotional disturbance.
Id. at 1263. Here, although the trial court concluded that Johnson's background did not reduce his culpability for the murder, Johnson's expert psychologist testified that the events of Johnson's childhood caused him to develop low frustration tolerance, impulsivity, depression, and anxiety. However, this case also involves the additional aggravator of murder committed while on felony community control and the conviction of kidnapping as additional support for the aggravator of murder in the course of a felony.
In Orme, this Court ruled a death sentence proportionate for a strangulation murder accompanied by a sexual battery and a robbery. The aggravators were sexual battery, HAC, and pecuniary gain. 677 *960 So.2d at 261. The Court rejected Orme's argument that death was disproportionate because his will was overborne by drug abuse and because the killing grew out of a "lover's quarrel":
Orme paints a portrait of himself as a person rendered conscienceless by drugs. But the State submitted competent substantial evidence that, despite his addiction, Orme was able to hold down a job and hide his drug abuse from his family. On the night of the murder he was able to drive a car without incident and talked in a normal manner with persons he encountered. Moreover, we decline to find that the instant homicide was a lover's quarrel. The argument supporting such a claim is simply too tenuous, resting primarily on a relationship with the victim that had ended. There is no evidence the murder was sparked by an emotional reaction to this breakup. Rather, competent substantial evidence shows this killing to be a strangulation murder designed to further both a sexual assault and a robbery, not a "lover's quarrel."
Id. at 263. The trial court in Orme found both statutory mental mitigating factors and gave them some weight. Id. at 261.
We find distinguishable the cases cited by Johnson to argue that his death sentence is disproportionate. In Voorhees v. State, 699 So.2d 602 (Fla.1997), and Sager v. State, 699 So.2d 619 (Fla.1997), this Court reversed the death sentences of two defendants who beat and stabbed a man to death. Like this case, both death sentences rested on HAC and murder in the commission of a felony (robbery). Sager, 699 So.2d at 621 n. 1; Voorhees, 699 So.2d at 606 n. 1. However, unlike this case, no third aggravator applied. This Court grounded its reversals of the death sentences in part on the fact that the murder occurred at the conclusion of a drunken episode in which all three men were intoxicated. Additionally, we pointed out in Voorhees' favor that he suffered from alcoholism and in Sager's favor that he suffered from mental illness and that Voorhees was the leader. Sager, 699 So.2d at 623; Voorhees, 699 So.2d at 615.
Like Voorhees and Sager, the murder in this case occurred at the conclusion of a night of heavy drinking. However, in addition to the third aggravator present here and absent in Voorhees and Sager, the "murder in the course of a felony" aggravator is qualitatively more significant in that it rests on two grave violent crimes, sexual battery and kidnapping, rather than the single violent crime of robbery. In addition, Voorhees and Sager acted in tandem, and the trial court found the statutory accomplice mitigator for both defendants (albeit giving it very little weight in both cases). In contrast, Johnson did not have an accomplice in the murder of Hagin; Vitale assisted only in the cover-up. Qualitatively, the murder in this case is more aggravated and less mitigated than in Voorhees and Sager.
We conclude, based on our qualitative review of the basis underlying each aggravator and mitigator and comparison with similar cases, that death is a constitutionally proportionate punishment for Johnson.

VIII. Effect of Rejection of Plea Offer
Johnson next asserts that the constitutional guarantees of due process of law and against cruel and unusual punishment render unconstitutional a death sentence imposed after a defendant rejects an offer to plead guilty to first-degree murder in exchange for a life sentence. His argument is both unpreserved and without merit. See Francis v. State, 473 So.2d 672, 677 (Fla.1985) (rejecting identical claim based on conclusion that, even if trial court had offered life sentence in exchange *961 for guilty plea, the death sentence "represents a reasoned judgment based on the circumstances of the capital felony and the character of the offender after giving due consideration to the jury's recommendation").
Accordingly, Johnson is not entitled to relief on this claim.

IX. Constitutional Challenges to Capital Sentencing
Johnson claims Florida's capital sentencing law, section 921.141, Florida Statutes, and standard jury instructions in capital cases are unconstitutional on six grounds: (1) the defendant bears the burden of proving death is inappropriate; (2) a death sentence can rest on a nonunanimous jury recommendation based on facts that are not found beyond a reasonable doubt, contrary to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (3) Florida's capital sentencing statute violates Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because a conviction of first-degree murder without more makes a defendant eligible for the death penalty, which fails to adequately narrow the field of first-degree murderers sentenced to death; (4) the instruction that a jury should find a mitigator only if it is "reasonably convinced" of its existence violates separation of powers; (5) an instruction to the jury that its role is advisory denigrates its responsibility, contrary to Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (6) no specific number of votes is required for jurors to find aggravators or mitigators.
We reject each of these arguments. First, Florida's capital sentencing statute does not unconstitutionally place a burden of proof on the defendant to prove death inappropriate in the event of equipoise between aggravators and mitigators. Reynolds, 934 So.2d at 1150-51; see also Kansas v. Marsh, ___ U.S. ___, ___, 126 S.Ct. 2516, 2525, 165 L.Ed.2d 429 (2006) (finding that Supreme Court precedents do not impose a specific method for balancing aggravating and mitigating factors). In addition, the jury in this case received special instructions that it should determine "whether the aggravating circumstances outweigh the mitigating circumstances that you find to exist," that the defense presentation of mitigating evidence "should not be construed as to shift or minimize the State's burden," and that, "regardless of your findings with respect to aggravating and mitigating circumstances, you are never required to recommend a sentence of death."
Second, Johnson is not entitled to relief under Ring because the "murder in the course of a felony aggravator" rests on the separate convictions of kidnapping and sexual battery, which satisfies Sixth Amendment requirements. See Douglas, 878 So.2d at 1264 (concluding that the defendant was not entitled to relief under Ring where the jury found him guilty of both sexual battery and felony murder during the commission or attempted commission of a sexual battery). Third, this Court has previously rejected the Furman claim raised by Johnson. See Blanco v. State, 706 So.2d 7, 11 (Fla.1997) (rejecting the argument that Florida's capital felony sentencing statute is unconstitutional because every person who is convicted of first-degree felony murder automatically qualifies for the death penalty). We also note that in this case, the jury's special verdict finding that the murder was both premeditated and felony murder and its separate verdicts of guilty of kidnapping and robbery further weaken his claim that the murder conviction alone qualified him for death.
Fourth, the fact that the instruction that jurors must be "reasonably convinced" that a mitigator exists does not unconstitutionally *962 limit the jury's consideration of all relevant evidence. We have upheld the standard instructions on mitigation, concluding that "[j]urors clearly are told they may consider anything relevant." Walls v. State, 641 So.2d 381, 389 (Fla.1994). Further, in Bogle v. State, 655 So.2d 1103 (Fla.1995), we rejected a similar argument that the language "[i]f you are reasonably convinced that a mitigating circumstance exists, you may consider it established," erroneously restricted the evidence that the jury considered in mitigation. Id. at 1108. Johnson's argument on this issue is without merit.
Fifth, the standard instruction to jurors that their role is advisory does not render capital sentencing unconstitutional. We have recently rejected Johnson's specific argument on this point. See Globe v. State, 877 So.2d 663, 673-74 (Fla.2004). Finally, Johnson cites no precedent holding that a specific threshold number or proportion of juror votes for either aggravating or mitigating circumstances is constitutionally required. A capital sentencing scheme passes constitutional muster if it rationally narrows the class of death-eligible defendants and permits the sentencer to consider any mitigating evidence relevant to its determination. Marsh, 126 S.Ct. at 2525-26. In Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the United States Supreme Court determined that the channeled discretion required by the Eighth Amendment is provided by Florida's scheme requiring statutory and mitigating circumstances to be found and weighed first by the advisory jury and then independently by the trial court. Id. at 248-52, 96 S.Ct. 2960.
All of Johnson's constitutional challenges to this State's capital sentencing scheme are without merit.

CONCLUSION
For the reasons set forth herein, we affirm Johnson's convictions, including his conviction of first-degree murder, and his sentence of death.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The trial court found the following nonstatutory mitigation: Johnson witnessed and suffered frequent physical and verbal abuse from his father (some weight); he had a history of extensive drug and alcohol abuse and was under the influence of alcohol at the time of the murder (moderate weight); he was sexually abused at a young age (some weight); he was a slow learner (no weight); he was able to show kindness to others (little weight); he exhibited good behavior in court (little weight); and he would adjust well to prison and would not commit further violent crimes (little weight).
[2] The trial court ruled the evidence inadmissible as a dying declaration because it did not concern the "physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death." § 90.804(2)(b), Florida Statutes (2006). The State does not challenge this ruling or assert dying declaration as an alternative basis for admission.
[3] We assume without deciding that Hagin's statement constituted hearsay under section 90.801(1)(c), Florida Statutes (2006), because the State has not argued to the contrary.
[4] Testimony earlier in the trial indicated Hagin did have children.
[5] Because it has not been argued, we do not address whether the statement could have been introduced under the "state of mind" exception in section 90.803(3), on the elements of the victim's confinement against her will essential to kidnapping and lack of consent essential to sexual battery.
[6] Although Johnson does not raise the issue, we also conclude that the evidence is sufficient to prove premeditated murder. The element of premeditation is supported not merely by the method used to kill, both manual and ligature strangulation, as well as the wound to Hagin's head made by a knife-like object, but also by Johnson's statements to Vitale that it took longer than expected to break someone's neck, and that Hagin told him during the crime that she wanted to see her children. Cf. Hitchcock v. State, 413 So.2d 741, 745 (Fla.1982) (finding that defendant's statement to jailmate that he choked the victim, took her outside, then choked her againall to quiet hersupported a finding of premeditation).
[7] Testimony supporting these mitigators included the following: Johnson's father was a heavy drinker who beat his wife and children and evidently had Vietnam flashbacks in which he confused family members for the enemy. After the father left, the mother had a fiancé who abused Johnson physically and verbally. Johnson's sister said a cousin sexually abused him many times. Johnson's expert psychologist, who spoke to several family members, reported that one brother masturbated and attempted to sodomize Johnson, and, with another brother, once tied a rope around Johnson's and his sister's neck and hung them from a tree, where they shook and turned blue until their grandfather cut them down.