# Supreme Court of Florida

————————

No. SC12-1204

————————

**RICHARD ALLEN JOHNSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————————

No. SC12-2464

————————

**RICHARD ALLEN JOHNSON,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[January 9, 2014]

PER CURIAM.

Richard Allen Johnson, who was twenty-three years old at the time of the crime, was convicted of the first-degree murder, kidnapping, and sexual battery with great force of Tammy Hagin. This Court affirmed his convictions and

sentence of death on direct appeal. Johnson v. State, 969 So. 2d 938, 962 (Fla. 2007). Johnson now appeals the denial of his initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's denial of relief and deny Johnson's petition for a writ of habeas corpus.

**FACTS AND PROCEDURAL HISTORY**

On direct appeal, this Court summarized the facts underlying this crime as follows:

> The victim in this case is Tammy Hagin. Johnson met Hagin on the evening of February 14, 2001, at a nightclub in Port St. Lucie. After Johnson and Hagin spent several hours together at the club, she accompanied Johnson to a residence he was sharing with others, including Johnson's roommate, John Vitale. Hagin and Johnson had several drinks at the club and left with a bottle of rum Johnson purchased. Hagin's brother and a friend, who were also at the club, followed in another car. Hagin and Johnson began drinking from the bottle on the drive to Johnson's residence. At the house, Johnson and his guests had mixed drinks and played pool for several hours. Hagin's brother and friend left after Johnson assured them he would get Hagin home. In the early morning hours of February 15, Vitale agreed to drive Hagin home to Vero Beach. Johnson, who did not have a driver's license, also went along. Hagin was ambivalent about returning home. The threesome went to Savannas State Preserve, a park where Johnson and Hagin had consensual sex while Vitale waited a short distance away. Afterward, Hagin remained uncertain whether she wanted to go home, so Vitale returned to the house in Port St. Lucie.
> There an argument ensued. A neighbor, Catherine Shipp, heard a woman screaming. When Shipp opened her front door a few minutes later, she heard the woman say, "I want to go home. Just let

- 2 -

me go." Shipp saw Johnson and Vitale outside the car, holding the car doors to prevent Hagin from exiting. According to Shipp, Hagin ultimately got out of the car. Johnson grabbed her from behind, picked her up, and took her inside the house. The woman kicked her feet, grabbed the door frame, and yelled, "I don't want to go in and clean up."

The commotion involving Hagin awoke other residents in the house where Johnson and Vitale were living. Thomas Beakley shared a bedroom with his girlfriend, Stacy Denigris, next to the bedroom Johnson shared with Vitale. Beakley heard a woman scream and then cry, and awoke Denigris, who left the room to check on the noise. Awakened by Beakley, Denigris heard a girl cry and say that she wanted to go home. Denigris opened the bedroom door to see a woman with brown hair holding onto the door frame of Johnson's bedroom. Johnson grabbed the woman from behind and yanked her into the bedroom. Denigris then saw Vitale in the garage, where the pool table and seating area were located, spoke to him there for a few minutes, and returned to bed.

Vitale, who had agreed to plead guilty to accessory to murder for a twenty-two-year sentencing cap, testified for the State. He stated that Hagin was loudly demanding to go to the bathroom and be taken home at the point when Johnson pulled her into his bedroom on the morning of February 15. The house then became quiet, and Vitale lay on the couch. Johnson eventually emerged from the bedroom and went into the bathroom. Vitale looked into the bedroom and saw that Hagin appeared to be sleeping. Johnson came out of the bathroom, found Vitale in the garage, and told him that Hagin was "gone." Asked what he meant, Johnson said he had broken her neck. Vitale testified that Johnson eventually told him that it takes longer to break someone's neck than he thought, and—over defense objection—that Hagin said as she was being strangled that she wanted to see her children.

Acting together, Johnson and Vitale wrapped Hagin's body in a deflated air mattress and placed it in the trunk of Vitale's car. The two men attempted to enlist the help of Johnson's friend, Shane Bien, in disposing of the body at sea. Bien allowed Johnson to call boat rental businesses and gave Johnson a fishing pole so it would appear they were fishing as they disposed of the body. According to Bien, Johnson said he'd killed a woman who was "the most annoying person he had ever met" and who "had tried to stab him with an

object." Johnson showed Bien the outline of a body wrapped in an air mattress in the trunk of Vitale's car.

Using money from Hagin's purse, Johnson and Vitale purchased a large cooler, [three] concrete blocks, a chain, and a padlock. They returned to the Savannas State Preserve, where they [rented a canoe and] submerged the body in several feet of water [attached to three concrete blocks, a chain, and a padlock. Records at the state park reflected that Vitale had rented a canoe the day of the murder.[1]] A fisherman discovered the body three days later.

[Vitale and Johnson moved into a different residence the day of the murder; the move had been prearranged. The person with whom they moved in testified that Vitale and Johnson had a large cooler when they moved into the house. She also witnessed them washing Vitale's vehicle, bleaching the floor mats, and tearing out a cushion on the back seat.]

Medical examiner Charles Diggs testified that Hagin died of strangulation in which the killer used both a ligature and a bare hand. Diggs testified that a strangulation victim starts to lose consciousness within fifteen to thirty seconds and that death occurs within three to four minutes. Hagin also had a superficial premortem cut on her scalp that was consistent with a knife wound, and bruises on her forehead and chin. There was also a postmortem laceration of her perineum, including the uterus, bladder, and vulva. Diggs could not rule out marine life as the cause of the damage to the perineum, although he said that marine animals will usually attack more than one area of the body. No semen was discovered in what remained of Hagin's vagina or uterus. Her blood alcohol level was .186, of which .04 to .06 could have been the result of decomposition.

Johnson and Vitale were both arrested within days of the discovery of Hagin's body. Vitale, questioned first, incriminated Johnson. Confronted with Vitale's statement, Johnson stated that he was drunk and lost his mind when Hagin was killed. He then said that he and Hagin were having sex and she was not fighting him, but "I put my hand on her neck and she died." Asked when he realized she was dead, he stated, "When we stopped having sex, when I got up and I

---

1. The additional facts appearing in this quote are derived from the trial record in this case.

said get up, and she didn't get up." Johnson adamantly denied mutilating Hagin's body.

Testifying in his own behalf at trial, Johnson stated that Vitale, who acknowledged at trial that he is gay and admitted being in love with Johnson, argued with Hagin throughout the evening and morning of February 14-15. When Johnson, Hagin, and Vitale ultimately returned to the house after their trip to the Savannas park, all three were arguing. Johnson grabbed her to calm her down and pulled her into the room to keep from disturbing others sleeping in the house. He said that he and Hagin then had consensual sex and he passed out for about an hour, discovering she was dead only when he awoke. Johnson said that in his statement to police, he meant that he had placed his hand in the area of her neck during sex, but did not choke or kill her. He explained that when he said he lost control, he meant that he lost control of the alcohol, stating, "I couldn't control how I was spinning, how I was standing." He also stated that he meant that he discovered she was dead after he had passed out, not immediately after sex.

Johnson further testified that after learning Hagin was dead, he found and told Vitale. Johnson testified that Vitale responded by saying "you killed her," and discouraged him from calling the police. Johnson believed that he had killed Hagin until he read Vitale's statement, particularly Vitale's assertion that Johnson stated he broke Hagin's neck, which Johnson stated was false. Johnson testified that he eventually came to believe that Vitale had killed Hagin.

Johnson, 969 So. 2d at 943-45.

The jury found Johnson guilty of first-degree murder and indicated in an interrogatory verdict that its finding was based on both premeditated and felony murder theories. Id. at 945. The jury also found Johnson guilty of kidnapping, sexual battery with great force, and theft of less than $300. Id.

After the penalty phase, the jury recommended death by a vote of eleven to one. Id. The trial court followed the jury's recommendation and imposed a

sentence of death.  Id. at 945-46.  The trial court found three aggravators: (1) that the murder was committed while Johnson was on community control (moderate weight); (2) that the murder was committed during the commission of a sexual battery or kidnapping or both (great weight); and (3) that the murder was especially heinous, atrocious, or cruel (HAC) (great weight).  Id. at 945.

The trial court found the statutory mitigator of no significant history of criminal activity and assigned it moderate weight.  Id.  However, the trial court rejected two statutory mental health mitigating circumstances—(1) that the murder was committed while Johnson was under the influence of extreme mental or emotional disturbance, and (2) that Johnson's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired.  Id.  The trial court also rejected the statutory age mitigator.  Id.

The trial court found seven nonstatutory mitigators: (1) Johnson witnessed and suffered frequent physical and verbal abuse from his father (some weight); (2) he had a history of extensive drug and alcohol abuse and was under the influence of alcohol at the time of the murder (moderate weight); (3) he was sexually abused at a young age (some weight); (4) he was a slow learner (no weight); (5) he was able to show kindness to others (little weight); (6) he exhibited good behavior in court (little weight); and (7) he would adjust well to prison and would not commit further violent crimes (little weight).  Id. at 945 & n.1.  Finding that the

aggravators outweighed the mitigators, the trial court sentenced Johnson to death

for the murder and imposed consecutive sentences of thirty years' imprisonment

for the kidnapping, life imprisonment for the sexual battery with great force, and

sixty days' imprisonment for petit theft. Id. at 945-46.

On direct appeal, Johnson raised nine claims.[2] This Court rejected all of

Johnson's claims and affirmed his convictions and sentence of death. Id. at 962.

Johnson filed a timely rule 3.851 motion for postconviction relief, which

was later amended, raising numerous claims.[3] After holding several Huff[4]

---

2. Johnson asserted the following claims: (1) the trial court erred in granting a challenge for cause to a potential juror over defense objection; (2) the trial court erred in admitting a statement by the victim while she was being strangled; (3) the trial court erred by allowing the State to proceed on a robbery count charged by information rather than indictment; (4) the trial court erred in permitting improper cross-examination of Johnson; (5) the evidence was insufficient to prove kidnapping, sexual battery, and felony murder; (6) his death sentence is disproportionate; (7) imposition of a death sentence is unconstitutional after Johnson rejected a plea bargain for a sentence of life imprisonment; (8) the trial court erred in finding HAC; and (9) six issues concerning the constitutionality of Florida's capital sentencing laws and procedures. Id. at 946.

3. Johnson raised the following claims: (1) section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 are unconstitutional; (2) requiring Johnson to file his rule 3.851 motion one year after his conviction became final violates due process and equal protection; (3) ineffective assistance of counsel for (A) failing to challenge the State's theory of guilt; (B) failing to object to evidence and argument, including (i) the admission of knives into evidence, (ii) the reference to the knives during the medical examiner's testimony, (iii) the prosecutor's misleading comments during the medical examiner's testimony regarding the victim's perineal wounds being the result of "cutting," (iv) the medical examiner's characterization of the death as "heinous," (v) Vitale's testimony that Johnson wanted to have sex with the victim while she was sleeping,

hearings, the postconviction court granted an evidentiary hearing on some of Johnson's claims and summarily denied the remaining claims.[5]

Thereafter, an evidentiary hearing was held over several days. At the hearing, Johnson presented testimony from the following individuals: John Vitale (Johnson's co-defendant); Thomas Burns (Vitale's trial defense counsel); Danielle Blount Fernandez (Johnson's sister); and Dr. Jethro Toomer (an expert in forensic psychology). Johnson also presented testimony from the three defense attorneys who worked on his case: Albert Moore, who briefly represented Johnson until

---

(vi) improper cross-examination of Johnson, and (vii) not requesting a limiting instruction on Vitale's testimony that the victim asked for her children when she was being strangled; (C) failing to effectively cross-examine Vitale; and (D) failing to protect Johnson's Fifth and Sixth Amendment rights by encouraging a letter writing campaign between Johnson and Vitale; (4) the State's use of Vitale as a State agent violated Massiah v. United States, 377 U.S. 201 (1964), Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959); (5) trial counsel were ineffective for failing to challenge the State's theory of the cause of death; and (6) trial counsel were ineffective in the penalty phase for failing to investigate, prepare, and present mental health mitigation.

4. Huff v. State, 622 So. 2d 982 (Fla. 1993). The procedure set forth in Huff has since been codified in Florida Rule of Criminal Procedure 3.851(f)(5)(A).

5. An evidentiary hearing was granted and held on all except the following claims: section 119.19 and rule 3.852 are unconstitutional (Claim (1)); requiring Johnson to file his rule 3.851 motion one year after his conviction became final is unconstitutional (Claim (2)); failing to object to the admission of knives into evidence (Claim (3)(B)(i)); failing to object to reference to the knives during the medical examiner's testimony (Claim (3)(B)(ii)); and failing to object to improper cross-examination of Johnson when the prosecutor twice asked Johnson whether witness Thomas Beakley was truthful (Claim (3)(B)(vi)).

November 2002; Robert Stone, the lead counsel representing Johnson; and Thomas Garland, who was appointed to represent Johnson after Moore withdrew from the case. Following the conclusion of the evidentiary hearing, the postconviction court denied Johnson's motion for postconviction relief.

On appeal of the postconviction court's denial of relief, Johnson raises twelve claims. His postconviction claims on appeal are as follows: (1) trial counsel were ineffective in the guilt phase for failing to (A) properly object to the prosecutor's misleading comments during the medical examiner's testimony regarding the nature of the victim's perineal wounds, (B) object to the medical examiner's characterization of the death as "heinous," (C) object to co-defendant Vitale's testimony that Johnson wanted to have sex with the victim while she was sleeping, (D) effectively cross-examine and impeach Vitale, (E) request a limiting instruction to ameliorate the impact of Vitale's testimony that the victim asked for her children while she was being strangled, and (F) protect Johnson's Fifth and Sixth Amendment rights; (2) cumulative error in the guilt phase mandates reversal; (3) the State violated Massiah, Brady, and Giglio by using Vitale as a State agent; (4) trial counsel were ineffective during the penalty phase for failing to fully investigate, prepare mitigation, and present mitigation; and (5) the trial court erred in summarily denying claims that trial counsel were ineffective for (A) failing to object to the admission of kitchen knives into evidence, (B) failing to object to the

medical examiner's testimony concerning the knives, and (C) failing to object to impermissible cross-examination. Johnson has also filed a habeas petition raising a single claim: that appellate counsel was ineffective for failing to raise an alleged violation of Miranda v. Arizona, 384 U.S. 436 (1966), on direct appeal. For purposes of this opinion, some of these claims are combined or reorganized in the analysis that follows; however, we deny all of the claims raised.

## ANALYSIS

### I. Guilt-Phase Ineffective Assistance of Counsel Claims

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court has explained that for a defendant to succeed on an ineffective assistance of counsel claim, the defendant must satisfy two requirements:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

To establish deficiency under <u>Strickland</u>, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." <u>Morris v. State</u>, 931 So. 2d 821, 828 (Fla. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." <u>Id.</u> "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." <u>Occhicone v. State</u>, 768 So. 2d 1037, 1048 (Fla. 2000).

As to the prejudice prong, the appropriate test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

Both prongs of the <u>Strickland</u> test present mixed questions of law and fact. <u>Sochor v. State</u>, 883 So. 2d 766, 771 (Fla. 2004). "In reviewing a trial court's

- 11 -

ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts." Mungin v. State, 932 So. 2d 986, 998 (Fla. 2006).

When a postconviction court summarily denies a claim, the following standard applies. Rule 3.851 provides certain pleading requirements for initial and successive postconviction motions. Fla. R. Crim. P. 3.851(e)(1)-(2). For example, the motion must state the nature of the relief sought, Fla. R. Crim. P. 3.851(e)(1)(C), and must include "a detailed allegation of the factual basis for any claim for which an evidentiary hearing is sought." Fla. R. Crim. P. 3.851(e)(1)(D). An evidentiary hearing should be held "whenever the movant makes a facially sufficient claim that requires a factual determination." Gore v. State, 24 So. 3d 1, 11 (Fla. 2009) (quoting Owen v. State, 986 So. 2d 534, 543 (Fla. 2008)). However, "[p]ostconviction claims may be summarily denied when they are legally insufficient, should have been brought on direct appeal, or are positively refuted by the record." Id. (quoting Owen, 986 So. 2d at 543). With these standards in mind, we turn to Johnson's guilt-phase ineffective assistance of counsel claims.

### A. Victim's Perineal Injuries

Johnson raises three claims relating to post-mortem injuries that the victim sustained to the perineum, the area between the anus and the external genitalia. At trial, the State's theory with respect to the perineal wounds was that Johnson inflicted the perineal injuries after the victim died in order to cover his tracks because he had sex with the victim. The defense's theory was that the injuries were caused by marine life while the body was submerged in water.

In his first claim related to this issue, on which an evidentiary hearing was granted, Johnson contends that his trial counsel were deficient for failing to object to the prosecutor's comments characterizing the victim's perineal wounds as a "cut" or "cutting," where the medical examiner, Dr. Diggs, testified that the injuries could have been either the result of a human cutting the body or of marine life. Johnson argues that the State's repeated use of the terms "cut" or "cutting" during its questioning of Dr. Diggs was prejudicial because the jury was left with the inescapable impression that Dr. Diggs conclusively determined that the victim was cut and that Johnson was the one who did it.

Dr. Diggs, the medical examiner, testified at trial that the victim sustained post-mortem injuries to the perineum and referred to the injuries as "laceration(s)," "cut(s)," "cutting," and "tearing." The State then inquired as to the cause of the injuries and asked whether two knives recovered from Johnson and Vitale's residence, which were introduced into evidence, could have caused the injuries.

Dr. Diggs testified that the knives "could have been" used to cause the injuries, but he could not definitely attribute the injuries to a cutting action. Dr. Diggs also testified that he could not rule out damage caused by marine life while the victim's body was submerged in water as a possible cause. After Dr. Diggs used the terms "cut" and "cutting," the State then used those terms in some of its questioning, with many of the questions focusing on whether the injuries were the result of cutting.

We conclude that trial counsel were not deficient for failing to object, or failing to renew an objection, to the State's use of the words "cut" or "cutting" during its questioning of Dr. Diggs. The State's use of the terms "cut" and "cutting" was consistent with Dr. Diggs' testimony. Further, throughout the State's questioning, Dr. Diggs repeatedly testified that he could not rule out marine life as the cause of the injuries, but that human cutting was the more likely scenario. The State was entitled to present testimony and evidence in support of its theory that the wounds to the perineal area were caused by Johnson in order to destroy any evidence linking him to the victim, just as the defense was entitled to present evidence and testimony as to its theory that the injuries were caused by marine life.

Moreover, trial counsel consulted with two forensic experts, Dr. Wright and Dr. Feagle, neither of whom disagreed with Dr. Diggs' findings. In fact, defense

counsel Garland testified at the evidentiary hearing that Dr. Wright had concluded that he could not testify that marine life caused the injuries because the injuries were too smooth to be caused by jagged jaws or teeth. Significantly, Johnson did not present any forensic evidence or testimony at the evidentiary hearing.

As Garland testified at the evidentiary hearing, the issue of whether it was human cutting or marine life that caused the perineal injuries was ultimately not the biggest issue in the case, as the defense theory was that Vitale had killed the victim and that either the injuries were the result of marine life after Vitale disposed of the body in the water or were the result of Vitale cutting the victim. Thus, counsel were not deficient for failing to object, or failing to renew an objection to, the prosecutor's comments, and we deny relief on this claim.

Johnson contends in his second and third claims relating to the victim's perineal injuries that the postconviction court erred in denying an evidentiary hearing on two summarily denied claims, which were as follows: (1) trial counsel were ineffective for failing to object to the admission of kitchen knives into evidence, where the State had failed to establish that the knives belonged to Johnson and the relevancy of the knives; and (2) trial counsel were ineffective for failing to object to Dr. Diggs' testimony concerning the knives that were admitted into evidence and the possibility that the knives could have caused the victim's wounds. Because we conclude that the knives were properly admitted under the

facts of this case, and because Dr. Diggs' testimony that the perineal wounds could have been caused by the knives was proper, these arguments are without merit. Counsel cannot be deficient for failing to raise a meritless objection. Schoenwetter, 46 So. 3d at 546. Accordingly, we conclude that the postconviction court properly denied these two claims without an evidentiary hearing.

### B. Medical Examiner's Use of the Term "Heinous"

In this claim, Johnson argues that his counsel were ineffective for failing to object to Dr. Diggs' one-time use in the guilt phase of the word "heinous" to describe the strangulation death. Specifically, Johnson contends that in using the term "heinous," Dr. Diggs rendered an improper opinion and that counsel's failure to object prejudiced him not only in the guilt phase as to his conviction, but also in the penalty phase as to his sentence. We disagree.

During the guilt phase, Dr. Diggs stated that strangulation was "a heinous type death." He did not use the term "heinous" again. The postconviction court found as follows with respect to this claim:

> The court finds that the medical examiner was not rendering an opinion concerning the HAC aggravating circumstance. The court agrees with trial counsel's evidentiary hearing testimony interpreting the medical examiner's "heinous" characterization merely as a description of the death, and not as a term of art. Consequently, the court finds no deficient performance or prejudice.

(Citation omitted.) We agree with the postconviction court and conclude that trial counsel were not deficient for failing to object to Dr. Diggs' one-time use of the

- 16 -

word "heinous" in the guilt phase.  See Hitchcock v. State, 991 So. 2d 337, 361 (Fla. 2008) ("Counsel cannot be deemed ineffective for failing to make a meritless objection.").

**C. Vitale's Testimony that Johnson Wanted to Have Sex with the Victim**

In this claim, Johnson contends that trial counsel were ineffective for failing to object to Vitale's testimony as to his opinion that Johnson wanted to have sex with the victim while she was sleeping, despite not being competent to testify regarding Johnson's thought processes or state of mind.  Johnson argues that Vitale's statement prejudiced Johnson because it improperly led the jury to believe he would seek to take advantage of a woman who was unable to consent to sexual intercourse.  This claim is without merit.

Vitale testified that the victim had fallen asleep and that when they arrived at the Savannas State Preserve and Johnson asked Vitale to leave Johnson and the victim alone and take a walk, Vitale "figured" it was because Johnson wanted to have sex with the victim.  However, Vitale did not testify that Johnson wanted to have sex with the victim while the victim was asleep.  Rather, Vitale's testimony was clear that Johnson and the victim subsequently exited the vehicle, that the victim was awake and willing when they did so, and that Johnson and the victim had consensual sexual intercourse outside of the vehicle.  Both defense attorneys present at trial testified at the evidentiary hearing that it required a strained reading

of Vitale's testimony to infer that Johnson intended to have sex with an unconscious woman at the state park. We conclude that defense counsel were not deficient for failing to object to Vitale's testimony.

We also deny Johnson's claim that Vitale's statement that he "figured" Johnson wanted to have sex was improper opinion testimony regarding a subject on which Vitale was not competent to testify. This argument is without merit because Vitale was simply testifying about his observations and interpretation of Johnson's nonverbal actions, which was proper. See § 90.604, Fla. Stat. (2006). Counsel cannot be deficient for failing to raise a meritless objection. Schoenwetter, 46 So. 3d at 546.

### D. Failure to Request a Limiting Instruction

In this claim, Johnson contends that his trial counsel were ineffective for not requesting a limiting instruction regarding Vitale's testimony that the victim asked for her children while being strangled, after trial counsel's objection to the statement was overruled. Specifically, Johnson argues that defense counsel made no effort to mitigate the clear prejudice of Vitale's statement by requesting an instruction that the jury consider the statement only to establish Johnson's state of mind and, as allegedly recognized by this Court on direct appeal, this failure prejudiced Johnson. We disagree.

Vitale testified at trial that the victim stated that she "wanted her children" while Johnson was choking her. Johnson, 969 So. 2d at 948. "The defense objected on grounds that the testimony went beyond the permissible scope of redirect examination, that the statement had little or no probative value and tremendous potential for unfair prejudice, and that it did not meet the criteria for either a dying declaration or an excited utterance." Id. The trial court overruled the objection, concluding that the statement was admissible as an excited utterance and that, although it was "extremely damaging," the potential for unfair prejudice did not substantially outweigh its probative value on the issue of premeditation. Id. Defense counsel did not request a limiting instruction. The statement was used by the State in its penalty-phase closing argument as supporting evidence of HAC and was relied upon by the trial court in finding HAC, as well as by this Court in upholding the HAC aggravator. Id. at 952, 957.

On direct appeal, this Court concluded that the statement was not inadmissible hearsay, that the statement was relevant and admissible to show premeditation, and that its probative value was not substantially outweighed by its potential for unfair prejudice. Id. at 948-52. With respect to probative value and evidentiary prejudice, this Court reasoned as follows:

> We acknowledge the statement's potential to create an emotional basis for the verdict. However, the prejudicial impact of the evidence could have been ameliorated to some extent by an instruction to consider the evidence solely on the issue of the defendant's intent.

- 19 -

Johnson complains on appeal that the trial court did not give a limiting instruction, but he made no request for such an instruction below and does not now claim that a limiting instruction would have been ineffective. Therefore, this aspect of his argument is waived. Further, we note that the State was cautious in its use of the statement. The prosecutor did not mention the statement again until the penalty phase, when he legitimately argued that it supported the HAC aggravator.

Accordingly, the potential for unfair prejudice . . . did not "substantially outweigh" the statement's probative value. We conclude that the trial court acted within its discretion under the rules of evidence, specifically sections 90.403 and 90.803(2), in allowing the State to introduce the statement over defense objection.

Id. at 952.

The postconviction court denied the claim that trial counsel were deficient for not requesting a limiting instruction, finding that counsel did not engage in an "unsound trial strategy" by deciding to proceed "in a manner that would not call attention to Vitale's testimony." Although this Court stated on direct appeal that "the prejudicial impact of the evidence could have been ameliorated to some extent by an instruction to consider the evidence solely on the issue of the defendant's intent," id., trial counsels' failure to object or move for a limiting instruction cannot be deemed deficient if it was the result of reasonable trial strategy. See Occhicone, 768 So. 2d at 1048. Here, counsel objected to the admission of the statement in an attempt to exclude it, but after the trial court ruled that the statement was admissible, counsel did not request a limiting instruction, which would have drawn further attention to the emotionally charged comment.

We conclude, based on this record, that counsel were not deficient for failing to request a limiting instruction. This Court has held that deciding not to draw attention to a comment can constitute sound trial strategy, including in situations where trial counsel deliberately chose not to object to a comment or chose to decline a curative instruction. See, e.g., Brown v. State, 846 So. 2d 1114, 1123 (Fla. 2003) (holding that counsel was not deficient for failing to object "when a witness identified an autopsy photo of the victim, and responded that the victim appeared in a worse condition than the witness had ever seen him," as "it reflected counsel's deliberate decision not to bring attention to the comment by objecting to it"); Cole v. State, 841 So. 2d 409, 416-17 (Fla. 2003) (holding that declining a curative instruction regarding State's statement of "mankind at its worst" was not deficient because "the curative instruction in this case would have had the effect of repeating the offensive comment"); cf. Salazar v. State, 991 So. 2d 364, 372 (Fla. 2008) ("[T]he trial court had the discretion not to give a curative instruction if it believed that doing so would draw further attention to the improper comment.").

Even assuming that counsel were deficient, Johnson has failed to demonstrate prejudice. Johnson contends that this Court recognized the prejudicial impact of Vitale's statement on direct appeal and therefore, "there is a judicial determination that such a limiting instruction would have been helpful" and that "the State, defense counsel and the trial court all presume their conclusions

regarding the prejudicial nature of Vitale's testimony is superior to this Court's."

However, Johnson overlooks that the prejudicial impact this Court was referring to

was prejudice for purposes of application of the section 90.403 evidentiary

balancing test. See Johnson, 969 So. 2d at 952. Although this Court recognized

the statement's "potential to create an emotional basis for the verdict" and that a

limiting instruction could have "ameliorated [this] to some extent," id. (emphasis

added), this does not equate to a judicial determination by this Court of Strickland

prejudice.

To the contrary, we conclude that any failure of trial counsel to request a

limiting instruction in this case does not undermine this Court's confidence in the

conviction. As outlined by this Court on direct appeal, strong evidence connected

Johnson to the murder. Further, this Court observed that "the State was cautious in

its use of the statement. The prosecutor did not mention the statement again until

the penalty phase, when he legitimately argued that it supported the HAC

aggravator." Id.

Accordingly, we deny this claim.

### E. Cross-Examination of Vitale

In this claim, Johnson argues that his trial counsel were ineffective for failing to effectively cross-examine Vitale.[6] Johnson contends that during cross-examination, trial counsel struggled to locate the references to Vitale's inconsistent prior statements and was admonished by the trial court for failing to properly conduct impeachment. This claim is without merit.

In denying this claim, the postconviction court found as follows:

> The court has reviewed the extensive cross-examination of Vitale's trial testimony during which counsel explored inconsistencies in the various statements concerning Vitale's role, level of participation, and injuries; Johnson's role and direction of Vitale; the victim's behavior, statements, and injuries; and the jail letter exchange between Vitale and Johnson. And although counsel may have struggled at times with his impeachment technique, the record reveals that counsel questioned Vitale on these three areas of inconsistency in Vitale's statements concerning the perineal wound, Johnson's admission to breaking the victim's neck, and Johnson's disclosure of the victim's request for her children. Further, the State investigator corroborated that Vitale had disclosed in his first statement Johnson's admission to breaking the victim's neck. Therefore, absent an evidentiary showing of what specific information counsel failed to bring out concerning these three areas of inconsistency in Vitale's statements, the court finds no prejudice to the outcome of the trial.

(Citation omitted.) Having reviewed the record, we conclude that the postconviction court's factual findings are supported by competent, substantial evidence, and that the court did not err as to its legal conclusions. Although, as the postconviction court found in its order, "counsel may have struggled at times with

---

6. Although an evidentiary hearing was granted on this claim, no testimony or evidence was presented at the hearing in support of this claim.

- 23 -

his impeachment technique," defense counsel succeeded in impeaching Vitale with respect to many of his prior inconsistent statements and demonstrating that Vitale had a motive to embellish his testimony.

In addition, Johnson contends that his counsel were ineffective for failing to move to have Vitale's original taped statement played for the jury, as the transcript used by defense counsel during his impeachment of Vitale reflected portions of the statement as "indiscernible." The effect of this, Johnson argues, was that Vitale was able to claim during his trial testimony that he had previously stated that Johnson told him he broke the victim's neck during an "indiscernible" portion of one of Vitale's statements, which was incomplete. We conclude that Johnson has not established that defense counsel were deficient for failing to play the tape for the jury when the tape was incomplete because portions were missing from the recording and there has been no demonstration that the tape itself was not also "indiscernible."

Accordingly, we deny this claim.

### F. Impermissible Cross-Examination of Johnson

This claim, in which Johnson argues that his trial counsel were ineffective for failing to object to impermissible cross-examination of Johnson when the prosecutor twice asked Johnson whether witness Thomas Beakley was truthful when he testified that the victim was crying, was summarily denied by the

postconviction court. On appeal, Johnson contends that he was entitled to an evidentiary hearing on this claim.

In rejecting a claim pertaining to this line of questioning on direct appeal, this Court held that despite the improper questioning, any error would have been harmless beyond a reasonable doubt and, for the same reason, not fundamental error. This Court reasoned as follows:

> Johnson responded to the questioning without stating that he thought Beakley was untruthful. In each instance, the question concerned only whether Hagin was crying or whining. Johnson parried the prosecutor's suggestion that either he or Beakley had to be lying by asserting that what Beakley heard as a cry, Johnson heard as a whine. There is no reasonable possibility that this exchange so affected the jury's view of Johnson's credibility that it contributed to the verdict.

Johnson, 969 So. 2d at 955.

We conclude that the postconviction court did not err in summarily denying this claim because it was "positively refuted by the record." Gore, 24 So. 3d at 11 (quoting Owen, 986 So. 2d at 543). Although Johnson argues that this Court's determination of harmless error does not foreclose a finding of prejudice, we conclude that trial counsel's failure to object to the questioning and testimony at issue does not undermine this Court's confidence in the conviction for the same reasons this Court found the error to be harmless on direct appeal. See Johnson, 969 So. 2d at 955.

## II. Claims Relating to the State's Alleged Use of Vitale as a State Agent and Letters Written Between Vitale and Johnson (<u>Strickland</u>, <u>Massiah</u>, <u>Brady</u>, and <u>Giglio</u>)

The next set of claims relates to Johnson's assertion that the State improperly used Vitale to elicit incriminating statements in a series of letters written between Johnson and Vitale while both were incarcerated after the murder. Johnson's theory at trial was that Vitale committed the murder because he was jealous that Johnson had a sexual relationship with the victim that evening. In support of this theory, "confession" letters written by Vitale were introduced into evidence. The State then introduced letters written from Johnson to Vitale, in which Johnson appeared to have coached Vitale on his confession.

Johnson's claims related to the letter writing fall into several categories. First, Johnson contends that his counsel were ineffective for encouraging, or failing to stop, a letter writing campaign between him and Vitale, and therefore counsel failed in their duty to protect Johnson's Fifth Amendment right against self-incrimination. Second, Johnson argues that Vitale was acting as a State agent attempting to elicit incriminating information from Johnson and, therefore, the State violated <u>Massiah v. United States</u> 377 U.S. 201 (1964); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Specifically, Johnson claims a <u>Brady</u> violation on the grounds that the State withheld favorable evidence from trial counsel, namely a letter written by Vitale's

attorney, Burns, to the State referring to Vitale possibly providing assistance to the State. We begin by reviewing the relevant trial and postconviction testimony and evidence as it pertains to this series of claims.

## A. Trial Testimony and Evidence

After being arrested, Vitale and Johnson wrote numerous letters back and forth. At trial, these letters were first mentioned during the State's direct examination of Vitale, but only insofar as referencing that Johnson asked for Vitale's help with the case, that Vitale and Johnson wrote notes and letters back and forth, and that Vitale could identify letters as being from Johnson because he recognized Johnson's handwriting and the content of the letters pertained to facts and experiences in common to Vitale and Johnson.

On cross-examination, the defense questioned Vitale about, and introduced into evidence, letters that Vitale had written to various individuals, in which he confessed to the crime. The defense introduced letters written by Vitale as eleven exhibits, in which Vitale confessed to the State Attorney in the case as well as to various individuals, including Johnson, Johnson's mother, Johnson and Vitale's former roommates, and Johnson's friends.[7] All of the letters were undated, but the letter to the State Attorney was attached to an envelope that was mailed on August

_____

7. There were a total of at least sixty-seven letters, but the trial court limited the number of letters each side could introduce and directed the attorneys to redact irrelevant portions of the letters.

8, 2002.  Upon being questioned about these letters, Vitale testified that Johnson gave him a list of individuals to whom he should write and that for each confession letter, there was a corresponding letter in which Johnson told Vitale what he should write.

On redirect, the State introduced into evidence a letter from Vitale to Johnson stating that he loved Johnson and wanted to help.  The State also introduced fourteen letters from Johnson to Vitale, which, among other things, pleaded for Vitale's help, asked Vitale to convince the State that Johnson did not commit the murder, gave Vitale detailed feedback and direction as to Vitale's draft confession, urged Vitale to promptly send a revised confession and get it notarized, and told Vitale not to say anything in letters that could incriminate Johnson.  In various letters, Johnson told Vitale that he cared deeply for him, that he loved him, and that Vitale had a permanent place in his heart.

All of the letters were undated,[8] and Vitale testified that he could not sequence any of the letters.  Later in the trial, defense counsel and the State both questioned Johnson about the letters.  Johnson testified that at the time he

---

8.  Although the letters were undated, several letters included some indication of the dates on which they were mailed or received.  One letter was mailed from Johnson to Vitale on December 17, 2001; one letter from Johnson to Vitale was forwarded by Vitale after he received it to his attorney, Burns, on December 17, 2001; and several letters were stamped "RECEIVED" by the State Attorney's office on May 7, 2004.

confessed to law enforcement, he thought he was guilty.  Johnson stated that he wrote his pleading letters to Vitale asking for help to avoid the death penalty when Johnson thought he himself had killed the victim.  Johnson testified that he eventually realized he was innocent and that Vitale was the killer.

In closing argument during the guilt phase, the State contended that the letters demonstrated that Johnson was a "user," a "manipulator," and a "murderer." The defense argued in response that it was ridiculous to believe that Vitale wrote the confession letters at Johnson's behest because no one would confess to a serious crime he or she did not commit, no matter how much he or she loved someone.

## B.  Evidentiary Hearing Testimony and Evidence

At the postconviction evidentiary hearing, Johnson introduced into evidence two letters written from Vitale to the State.  The first was dated October 22, 2003. The letter began by stating, "Today Mr. Hamrick [the State investigator] came to see me to pick up a letter I received from Rich [Johnson].  I explained to him that I had a letter for Rich in response to his."  Vitale explained that he was enclosing a letter that he wished for the State Attorney to mail for him and that "[b]y sending this letter to you—I feel at least I'm going through the right channels this time." Toward the end of the letter, Vitale stated: "I truly hope that by the time you

receive this letter, you've taken me off of PC[9]. I explained it to Mr. Hamrick. I hope also that we will be going over everything about this case soon." The second letter is an undated, handwritten note to the State, which read as follows: "Enclosed please find another letter I received from Richard on 3-3-04 and note the return address. I'm trying to get a copy of the reply letter I sent."

Johnson also introduced a letter dated January 14, 2003, which was written by Vitale's attorney, Burns, to the State (the "Burns Letter"). The letter contained statements such as the following: "My guy is exceedingly impatient and exasperated at the delay in setting up the assistance we discussed a long time ago"; "I thought that you and I were on the same page as to the desirability of putting [Vitale's] letters into a proper context, and quite possibly getting the co-defendant to confess on tape"; and "My hope, of course, is that Vitale's cooperation would earn him a lighter sentence, and yours is that Johnson would confess to Vitale . . . , thus removing a thorn in the side of your case by preventing [Johnson's defense attorney] Bob Stone from claiming that [Vitale's] letters are true confessions."

At the evidentiary hearing, Johnson also presented testimony from the three defense attorneys who worked on his case: Moore, Stone, and Garland. In addition, Johnson presented testimony from Vitale and Thomas Burns, Vitale's trial defense counsel.

_____

9. It is not explained what "PC" means.

Defense counsel Moore testified that he was Johnson's trial counsel toward the beginning of the case, and the record reflects that Moore was relieved from representing Johnson in November 2002. Moore testified that he did not encourage the communication between Johnson and Vitale because in Moore's opinion, it was not a good idea to have his clients communicate with anyone. Moore was not aware that Vitale was communicating directly with the State.

Defense counsel Garland, who was appointed as co-counsel to replace Moore in February 2003 and who represented Johnson at trial, testified that he believed he was made aware of communications between Johnson and Vitale from Moore and that he eventually saw the letters prior to trial. However, Garland did not encourage Johnson to continue writing to Vitale. Garland testified that he became aware at some point that Vitale was trying to make a deal with the State, and that it would have been good for the defense to know that Vitale was writing directly to the State, as it could have been used as impeachment to undermine Vitale's credibility. When shown the Burns Letter, Garland stated that he did not recall seeing it prior to trial, but that the mention of wearing a wire indicated that Burns was attempting to have Vitale work as a State agent. On cross-examination by the State, Garland acknowledged that he did not know what was in Burns' mind when he wrote the letter.

Defense counsel Stone, who was co-counsel at Johnson's trial, testified that after he obtained Vitale's confession letter, he sent the letter to the State. Stone was not aware of Vitale's communications directly with the State until the State turned over those letters shortly before trial. Stone recalled that Burns testified during a deposition that he had held on to many of the letters for a while and then just prior to trial, turned them over to the State. Stone was also not aware that Johnson wrote letters back to Vitale until shortly before trial. If Stone had known that Johnson was writing to Vitale, he testified that he would have told Johnson not to do it. At one point, Johnson told Stone that Vitale was interested in confessing, and Stone told Johnson that if Vitale wanted to confess, it would be best to get that in writing. However, Stone did not tell Johnson how to get Vitale's confession in writing, and Stone stated that he warns his clients that there is no privacy in prison and that anything they say or write can be used against them.

When shown the Burns Letter, Stone stated that he did not recall seeing the letter until a few days before the postconviction evidentiary hearing. If Stone had seen the Burns Letter prior to trial, he testified that he would have used it. He also would have told Johnson to stay as far away from Vitale as possible. Stone testified that the Burns Letter implied that Vitale was working as a State agent, but that Stone did not have any evidence or direct knowledge that this was the case.

Vitale testified that Burns, his defense counsel, advised him to be truthful and did not say anything to Vitale about helping the State. Vitale testified that the letter writing between him and Johnson started as Johnson's idea. Vitale told Burns about the letters after the letter writing started, but the letter writing continued after that conversation. However, Vitale could not remember for how long the letter writing continued.

With respect to the letters Vitale wrote to the State, he testified that he probably wrote the letters because he could not get in touch with Burns. Vitale testified that he did not receive any letters back from the State explaining that it was inappropriate for Vitale to contact the State. Vitale testified that state investigator Hamrick came to see him in jail and that he delivered letters directly to Hamrick, but that Vitale gave most of the letters to Burns. Vitale further testified that he wrote confession letters to Johnson in order to buy time so that he could get in touch with the State in order to wear a wire. Vitale testified that wearing a wire was his idea, but that he did not discuss the idea with the State, despite attempting to do so. Vitale had spoken to Burns about it, but according to Vitale, Burns had failed to relay the message to the State.

According to Burns, the letter writing between Vitale and Johnson continued after Burns was appointed as Vitale's counsel, but Burns neither encouraged nor discouraged it. At some point, Burns informed the State as to the letters between

Vitale and Johnson. Burns also informed the State that Burns was in possession of those letters and that Vitale might be willing to offer testimony against Johnson for a sufficient reward. Burns did not recall Vitale writing directly to the State, and he did not encourage Vitale to do so. However, that did not mean that Vitale did not write to the State directly, because Vitale was "not fully under [Burns'] control." Burns testified that the case was taking a long time and that Vitale wanted to be done with it for a number of reasons, many of them personal. Vitale had told Burns that he wanted the case resolved, no matter what the result. Burns stated that Vitale was emotional and that Burns was concerned that Vitale might be untruthful and act against his own interests.

Regarding the Burns Letter, Burns testified that it was unusual that he would actually write a letter to the State, preferring to communicate in person. Burns was asked about the mention in the letter of a thorn in the side of the State's case, and he responded that this was a reference to the confession letters written by Vitale. Burns explained that the purpose of the Burns Letter was to show Vitale that Burns was bringing up the issues to the State and that Burns was not letting Vitale down. Burns testified that he showed the letter to Vitale.

On cross-examination by the State, Burns stated that to his knowledge, Vitale was not acting as an agent of the State in eliciting statements from Johnson. Rather, any correspondence between Vitale and Johnson was completely organic

and at no one's instruction. Burns also testified that wearing a wire was Vitale's idea, and Burns never would have suggested it because Vitale was not completely reliable or controllable. On redirect, Burns testified that Vitale met directly with the State once or twice without Burns present because of scheduling issues, but Burns would have expected Vitale to tell him what happened.

## C. Trial Court's Order

In denying Johnson's ineffective assistance of counsel claim regarding the letters, the postconviction court found in pertinent part as follows:

> The court notes the relevant timeline. In 2001, the offenses were committed and Johnson was indicted. Moore was appointed to represent Johnson. Stone was later retained to represent Johnson. Moore stayed on as second chair. Vitale sent a "confession" letter to Stone. On July 2, 2002, Stone sent Vitale's "confession" letter to the prosecutors. On November 20, 2002, Moore was discharged from representation. In January 2003, Garland was appointed to succeed Moore. On January 14, 2003, Burns sent a letter to the prosecutors referring to the Vitale plea negotiations. On October 22, 2003, Vitale sent a letter to the prosecutors referring to his contact with the State investigator, a letter to Vitale from Johnson, and a letter to Johnson from Vitale. In March 2004, Vitale sent a note to the prosecutors referring to a letter to Vitale from Johnson. In June 2004, the trial was conducted. In August 2004, [Johnson] was sentenced.
>
> It is undisputed that Vitale communicated directly with Johnson, the prosecutors, the State investigator, Burns, and Stone. There is no evidence that the prosecutors initiated the contact or responded to Vitale. And there is no evidence that undermines Vitale's testimony that wearing a wire was his idea. Although there is reference to a jail visit by the State investigator, no testimony of the investigator or prosecutors was offered to explain the purpose of the visit. And the court declines to infer that the investigator's visit was for the purpose of enticing or arranging for Vitale to elicit incriminating evidence from Johnson.

Burns, Moore, Garland, and Stone are experienced trial attorneys and credible witnesses. There is no evidence that these attorneys had knowledge that the prosecutors initiated, encouraged, or responded to Vitale; or that the State was otherwise using Vitale to deliberately elicit incriminating statements from Johnson.

Stone and Garland were unaware of Vitale's direct communication with the prosecutors until shortly before trial. They were unaware of Burns' January 14, 2003, plea negotiation letter until shortly before the postconviction evidentiary hearing. However, no evidence was presented to demonstrate a willful discovery violation by the State with respect to the letter.

Moore, Stone, and Garland did not encourage Johnson to communicate with Vitale. Stone's explanation is credible as to his comment to Johnson that if Vitale's attorney would not let Vitale talk to the State, Vitale should put it in writing. The court does not interpret this as advice to Johnson to communicate with Vitale. And, as standard practice of seasoned criminal defense attorneys, the court finds all three attorneys would have warned Johnson of the risks of jailhouse communication.

Burns' explanation is credible as to his attempt to manage his uncontrollable client Vitale, and Vitale's expectations by addressing the recording in the January 14, 2003, letter. Burns corroborated Vitale's testimony that it was Vitale's idea to wear a wire.

In conclusion, Johnson has failed to meet his burden of proving that the State was using Vitale to deliberately elicit incriminating statements from Johnson or that Vitale was otherwise a State agent, and that counsel failed to protect Johnson from Vitale. Further, [Johnson] fails to demonstrate prejudice of the letters to the outcome of the trial where the defense strategy was that Vitale, not Johnson, killed the victim. The letters were the only evidence other than Johnson's testimony that tied Vitale to the victim, thus supporting the viability of the defense. And at trial, the State introduced no statements made by Johnson after the letters began as proof for the charged crimes that would otherwise demonstrate prejudice.

(Citation omitted.) In denying Johnson's Massiah, Brady, and Giglio claims, the

postconviction court found as follows:

The court adopts its analysis [with respect to the ineffective assistance of counsel claim regarding the letters] to find no merit to Johnson's claims that the State deliberately elicited incriminating statements from Johnson and withheld evidence of Vitale's agent where there is insufficient evidence to show an "overt scheme" by the State, and where the terms of Vitale's plea agreement were disclosed at trial. Further, Johnson otherwise fails to demonstrate that Vitale's plea agreement testimony was false or that any terms of the plea agreement were undisclosed to Johnson. Consequently, the court finds no violation of Massiah, Brady, or Giglio.

(Citation omitted.) We now turn to an analysis of Johnson's ineffective assistance of counsel claim pertaining to the letters and then Johnson's Massiah, Brady, and Giglio claims. For the reasons set forth below, we conclude that the postconviction court's factual findings are supported by competent, substantial evidence and that Johnson is not entitled to relief.

### D. Ineffective Assistance of Counsel Claim

Johnson contends that his counsel were ineffective for encouraging, or failing to stop, a letter writing campaign between him and Vitale and, therefore, counsel failed in their duty to protect Johnson's Fifth Amendment right against self-incrimination. We reject Johnson's argument and conclude that Johnson's trial counsel were not deficient in failing to halt the letter writing campaign between Johnson and Vitale.

First, all three of Johnson's defense attorneys—Moore, Stone, and Garland—testified at the evidentiary hearing that they did not encourage Johnson to write the letters. The postconviction court specifically found that Moore, Stone,

and Garland were "experienced trial attorneys and credible witnesses." Further, the postconviction court found that "as standard practice of seasoned criminal defense attorneys, the court finds all three attorneys would have warned Johnson of the risks of jailhouse communication." These findings are supported by competent, substantial evidence.

Second, there was no evidence presented that Johnson's defense attorneys were aware that Vitale was writing letters directly to the State until shortly before trial. As the postconviction court found, "Stone and Garland [the two attorneys who represented Johnson at trial] were unaware of Vitale's direct communication with the prosecutors until shortly before trial."

Third, to the extent that Johnson relies on the Burns Letter and the testimony of defense counsel regarding how their approach would have changed if they had seen the letter, the Burns Letter is also the subject of Johnson's Brady claim based on the State's failure to disclose the Burns Letter. Defense counsel cannot be deemed deficient based on a document that they never received. See Roberts v. State, 568 So. 2d 1255, 1259 (Fla. 1990).

In conclusion, the postconviction court's finding that "[t]here is no evidence that these attorneys had knowledge that the prosecutors initiated, encouraged, or responded to Vitale; or that the State was otherwise using Vitale to deliberately elicit incriminating statements from Johnson" is supported by competent,

- 38 -

substantial evidence.  Johnson has not demonstrated that his counsel encouraged the letter writing between Vitale and Johnson or that they were deficient in failing to halt it.  Accordingly, he is not entitled to relief on this claim.

### E.  Massiah Claim

Next, Johnson argues that the State utilized Vitale as a State agent to obtain incriminating information from Johnson.  Johnson contends that this is evidenced by the Burns Letter, which was withheld from the defense in violation of Brady; letters from Vitale to the State; and the fact that the State investigator, Hamrick, visited Johnson in jail for the purpose of getting the letters directly from Vitale.

The State contends that this claim is procedurally barred.  Johnson asserts that the claim is not barred because the State withheld pertinent information pointing to a Massiah violation, including the Burns Letter, on which this claim in large part relies.  Because the Burns Letter, as discussed below in our analysis of Johnson's Brady claim, was not disclosed by the State, Johnson is not procedurally barred from bringing this claim in his postconviction relief proceeding.

Turning to the merits of this claim, this Court has explained the holding and import of Massiah as follows:

> In Massiah, the United States Supreme Court announced for the first time that the Sixth Amendment prohibits law enforcement officers from interrogating a defendant after his or her indictment and in the absence of counsel.  Consequently, statements "deliberately elicited" from a defendant after the right to counsel has attached and in the absence of a valid waiver are rendered inadmissible and cannot

be used against the defendant at trial. 377 U.S. at 206. Nevertheless, incriminatory statements by a defendant will not be excluded merely because the statements are made after judicial proceedings have been initiated and in the absence of a valid waiver. Rather, law enforcement officials must do something that infringes upon the defendant's Sixth Amendment right.

While the "deliberately elicited" standard is clearly satisfied when the police directly interrogate or question a defendant in some fashion, it also may be satisfied by less direct types of questioning. Usually, determining whether the "deliberately elicited" standard has been met becomes an issue in cases . . . where incriminatory statements from a defendant were obtained through persons other than the police who allegedly acted as police informants or surrogates.

Smith v. State, 28 So. 3d 838, 857-58 (Fla. 2009) (citations and alterations omitted) (quoting Rolling v. State, 695 So. 2d 278, 290 (Fla. 1997)). However, "a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported [the defendant's] incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986) (emphasis added). The United States Supreme Court has applied the "deliberately elicited" standard to information garnered by jailhouse informants. See Maine v. Moulton, 474 U.S. 159, 176 (1985); United States v. Henry, 447 U.S. 264, 270 (1980).

We conclude that the evidence presented in this record falls short of demonstrating a Massiah violation. The postconviction court did not err in its

- 40 -

finding that "Johnson has failed to meet his burden of proving that the State was using Vitale to deliberately elicit incriminating statements from Johnson or that Vitale was otherwise a State agent."

We begin our analysis of Johnson's <u>Massiah</u> claim by setting forth two significant facts that place the letters and this claim in context. First, it is undisputed that Johnson—not the State—initiated the letter writing between Johnson and Vitale and that Johnson was the motivating force behind Vitale's confession letters. Second, as pointed out by the State, Johnson's letters are not incriminating in the sense that they directly implicated him in the crime. Rather, the letters were used by the State at trial to undermine Vitale's written confessions by demonstrating that Johnson had manipulated Vitale into confessing.

Against this backdrop, we now discuss Johnson's arguments, which primarily rely on three pieces of evidence in support of his claim that Vitale was working as a State agent. The first is the Burns Letter. In denying this claim, the postconviction court specifically found that Burns was an "experienced trial attorney[] and [a] credible witness[]." The postconviction court further found that "Burns' explanation is credible as to his attempt to manage his uncontrollable client Vitale, and Vitale's expectations by addressing the recording" sought by Vitale in the Burns Letter. Although Johnson disagrees with the postconviction court's finding of credibility as to Burns, this Court has explained that it is "highly

- 41 -

deferential to a trial court's judgment on the issue of credibility" based on the trial court's "superior vantage point." Archer v. State, 934 So. 2d 1187, 1196 (Fla. 2006) (quoting State v. Spaziano, 692 So. 2d 174, 178 (Fla. 1997)). We conclude that the postconviction court's finding with respect to the Burns Letter is supported by competent, substantial evidence.

Burns testified at the evidentiary hearing that the "primary purpose" of the letter was for him to "show Mr. Vitale that, hey, I am bringing up these issues to [the State] that are concerning you and the ball is in their court. I am not letting you down. I am not failing to do what you want me to do. So it is kind of a dual-purpose communication, if you will." Burns further testified that he "never really regarded [Vitale] as being completely patient and completely under my control and guidance." Further, Burns emphatically denied that Vitale was acting as an agent of the State in eliciting statements from Johnson: "Whatever correspondence occurred between them was completely organic between the two of them. It was at nobody's instruction."

With respect to the reference in the letter of getting Johnson to "confess on tape," Burns testified that wearing a wire was Vitale's idea. Vitale also testified at the evidentiary hearing that wearing a wire was his idea and that he did not have any discussions with the State about the idea. Rather, he stated that he had directed

his counsel, Burns, to speak to the State about it, but Burns did not think it was a good idea and had failed to relay the message.

To the extent that Johnson relies on the evidentiary hearing testimony of his defense counsel-explaining what they interpreted the Burns Letter to mean, this speculation does not constitute evidence of its purpose and meaning. Further, each of Johnson's trial counsel testified that he did not know or have any direct knowledge of whether Vitale was acting as a State agent.

As his second piece of evidence in support of this claim, Johnson points to letters from Vitale written directly to the State. Johnson argues that the State was made aware, through Vitale's letters directly to the State, of the letter writing campaign between Vitale and Johnson, and did nothing to dissuade Vitale's conduct. However, passive knowledge and failure to dissuade Vitale from writing letters to Johnson does not rise to the level of the "deliberately elicited" standard. The United States Supreme Court has explained that a defendant does not make out a Massiah violation "simply by showing that an informant, either through prior arrangement or voluntarily, reported [the defendant's] incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann, 477 U.S. at 459. As the postconviction court found, "[t]here is no evidence that the prosecutors initiated

- 43 -

the contact or responded to Vitale." Indeed, the record is clear that Johnson actually initiated the letter writing between himself and Vitale.

The third primary piece of evidence on which Johnson relies is that the State investigator, Hamrick, visited Vitale in jail in October 2003 for the purpose of obtaining the letters directly from Vitale. However, as the postconviction court found, "[a]lthough there is reference to a jail visit by the State investigator, no testimony of the investigator or prosecutors was offered to explain the purpose of the visit. And the court declines to infer that the investigator's visit was for the purpose of enticing or arranging for Vitale to elicit incriminating evidence from Johnson."

In sum, we conclude that based on the evidence presented in this case, Johnson has not demonstrated a Massiah violation.

## F. Brady Claim

Johnson also contends that the State violated Brady by not disclosing the Burns Letter. To demonstrate a Brady violation, Johnson must show that (1) favorable evidence, either exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, Johnson was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Way v. State, 760 So. 2d 903, 910 (Fla. 2000). To meet the materiality prong, Johnson must demonstrate "a reasonable probability that the jury verdict would

- 44 -

have been different had the suppressed information been used at trial." Smith v. State, 931 So. 2d 790, 796 (Fla. 2006) (citing Strickler, 527 U.S. at 289, 296). A reasonable probability is a probability sufficient to undermine confidence in the outcome. See Way, 760 So. 2d at 913; see also Strickler, 527 U.S. at 289-90. In reviewing a Brady claim, "this Court defers to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but reviews de novo the application of those facts to the law." Lightbourne v. State, 841 So. 2d 431, 437 (Fla. 2003).

We conclude that the first two prongs of Brady are met. As to the first prong, the Burns Letter was favorable evidence, as it indicated that Vitale had a demonstrative motive to keep writing to Johnson as well as to testify in the case. It should have been disclosed by the State. As to the second prong, the evidence demonstrates that the Burns Letter was not disclosed to trial counsel. None of Johnson's trial attorneys recalled seeing the Burns Letter before postconviction counsel showed it to them.

We conclude, however, that Johnson's claim is without merit because Johnson cannot demonstrate the third and final prong—prejudice. Although the Burns Letter provided additional evidence of Vitale's motive to testify, Vitale's motive to testify in exchange for a favorable plea agreement was already disclosed to the jury, and the Burns Letter simply discloses that Vitale desired to work with

the State in order to obtain a confession from Johnson in exchange for a lighter sentence. Accordingly, we deny this claim.

### G. Giglio Claim

Johnson references Giglio[10] in his briefs, but does not make a specific argument for a Giglio violation other than stating that an agreement with a government witness for testimony in exchange for favorable treatment should be disclosed. This claim is insufficiently argued. See Victorino v. State, 23 So. 3d 87, 103 (Fla. 2009). Moreover, even considering the merits of this claim, Johnson is not entitled to relief. As found by the postconviction court and discussed above, there is insufficient evidence that Vitale was working as a State agent. Further, the details of the plea agreement between Vitale and the State were disclosed at trial.

### III. Cumulative Error in the Guilt Phase

In his next claim, Johnson contends that cumulative error requires reversal, raising this claim only as to his guilt-phase ineffective assistance of counsel claims. However, Johnson "is not entitled to relief on his cumulative error claim because

---

10. To establish a Giglio violation, it must be shown that: "(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." Guzman v. State, 868 So. 2d 498, 505 (Fla. 2003). "[T]he false evidence is material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " Id. at 506 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). "The State, as the beneficiary of the Giglio violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt." Id.

the alleged individual claims of error are all without merit, and, therefore, the contention of cumulative error is similarly without merit." <u>Dufour v. State</u>, 905 So. 2d 42, 65 (Fla. 2005).

## IV.  Penalty-Phase Ineffective Assistance of Counsel Claim

In this claim, Johnson contends that his trial counsel were ineffective for failing to promptly investigate and prepare mitigation.  Johnson also argues that his trial counsel were ineffective in failing to effectively present mitigation evidence. He asserts, in essence, that although trial counsel presented evidence in support of statutory mitigation that was rejected by the trial court, trial counsel could have done a <u>better</u> job.  He also argues that although Dr. Williams—the expert who testified at trial—found evidence of Post-Traumatic Stress Disorder (PTSD) as reflected in a written report, trial counsel simply did nothing with it.  This claim is without merit.

At the evidentiary hearing, Johnson presented testimony on this issue from Garland (the defense counsel who handled the mitigation aspects of trial), Dr. Jethro Toomer (an expert in clinical and forensic psychology), and Danielle Blount Fernandez (Johnson's sister who testified at trial).  Johnson also introduced into evidence two reports written by Dr. Williams.

### A.  Failure to Investigate and Prepare Mental Mitigation

Johnson claims that trial counsel were ineffective for failing to "promptly" investigate and prepare mental mitigation. In support, he contends that as of a status hearing in October 2003, trial counsel informed the court that they had yet to provide the experts with any records or obtain or review any records themselves. However, the penalty phase of the trial took place in June 2004—eight months after the October 2003 status hearing. Thus, this is not a case where the evidence demonstrates that investigation and preparation did not begin until shortly before the penalty-phase trial.

Under the facts of this case, although trial counsel may have failed to investigate and prepare mental health mitigation as "promptly" as Johnson believes counsel should have done, this does not per se render counsel deficient in investigation and preparation, as Johnson appears to contend. Indeed, Johnson does not specifically point to any mental health mitigation that should have been uncovered but was not due to a lack of investigation or preparation. Significantly, the postconviction court found that Dr. Toomer, the expert presented at the evidentiary hearing, did not testify to any new facts that were unknown to Dr. Williams or Dr. Brugnoli (who had conducted neuropsychological testing but did not testify at trial) at the time of their pretrial evaluations.

Accordingly, we conclude that Johnson has not demonstrated that his counsel were deficient in failing to investigate and prepare mitigation.[11]

## B. Failure to Effectively Present Mental Mitigation

Johnson's claim regarding the failure to present mental mitigation is in essence twofold: (1) although Dr. Williams diagnosed Johnson with PTSD, trial counsel failed to utilize this information at trial; and (2) trial counsel failed to effectively utilize available mental health mitigation at trial to paint a detailed picture of Johnson's mental health and how it affected him at the time of the crime.

---

11. In his Reply Brief, Johnson raises for the first time three additional claims that counsel were deficient because they (a) did not hire a mitigation specialist, (b) failed to adequately prepare Johnson's sister for her deposition, meeting with Dr. Williams, or her trial testimony, and (c) failed to timely and adequately provide Johnson's mental health experts with all the necessary records and information. An issue may not be raised for the first time in a reply brief. Hoskins v. State, 75 So. 3d 250, 257 (Fla. 2011) ("[T]his argument was not raised in the initial brief filed here. Accordingly, the claim is barred.").

Further, these arguments are without merit. Trial counsel is not deficient simply because he did not hire a mitigation specialist. See id. at 256 ("[T]o the extent Hoskins argues that counsel was deficient solely for failing to hire a mitigation specialist, the claim is conclusory. Failure to use an 'expert' in mitigation investigation does not per se constitute ineffective assistance."). Regarding Johnson's sister, Johnson again offers only conclusory arguments. Further, Johnson's sister testified the same at the evidentiary hearing as she did during the trial. Finally, with respect to trial counsels' failure to provide Johnson's mental health experts with all the necessary records and information, Johnson does not point to what specific records or information trial counsel failed to provide. Moreover, Dr. Toomer in his evidentiary hearing testimony did not point to any additional facts or information that were not known or provided to Dr. Williams.

With respect to PTSD, Johnson contends that evidence of Johnson's PTSD was in Dr. Williams's report, but that trial counsel simply did nothing with it. However, it is important to be clear that Dr. Williams's trial testimony regarding PTSD—namely, that Johnson's background suggested that he may have experienced PTSD throughout his childhood—was consistent with Dr. Williams's written reports. Dr. Williams did not diagnose Johnson with having PTSD at the time of the murder in either his written reports or his trial testimony. Simply put, the trial record reflects that trial counsel presented the substance of Dr. Williams's written reports to the jury.

In contrast to Dr. Williams, Dr. Toomer diagnosed Johnson with PTSD and explained how PTSD affected Johnson's behavior in adulthood. To the extent that Johnson relies on Dr. Toomer's differing diagnosis with respect to PTSD, he has failed to establish deficiency. Experts often have different diagnoses and arrive at different conclusions, as acknowledged by Dr. Toomer during the evidentiary hearing. The fact that Johnson has "now secured the testimony of [a] more favorable mental health expert[] simply does not establish that the original evaluations were insufficient." Carroll v. State, 815 So. 2d 601, 618 (Fla. 2002). In conclusion, Johnson "did not prove that a reasonable trial attorney should have known to not rely on the conclusions offered by the mental health experts who

evaluated him [prior to trial].  Thus, he did not prove that his counsel [were] deficient."  Stewart v. State, 37 So. 3d 243, 253 (Fla. 2010).

Turning to Johnson's claim that his trial counsel failed to effectively utilize available mental health mitigation at trial, except for the difference in opinion with respect to PTSD, Dr. Toomer's testimony regarding the diagnoses at the evidentiary hearing largely mirrored that of Dr. Williams at trial.  Indeed, Dr. Toomer admitted as much at the evidentiary hearing.  Dr. Toomer also opined as to the existence of the same two statutory mental health mitigators as Dr. Williams in his report and at trial, which were rejected by the trial court.  Dr. Toomer further testified that he "agree[d] with Dr. Williams' assessment," other than not seeing in his report that the PTSD factors impacted his final decision.

The crux of Johnson's argument on this point is that Dr. Toomer did a better job of presenting his findings than Dr. Williams and that trial counsel should have utilized Dr. Williams more effectively at trial.  However, the record reflects that trial counsel consulted with two mental health experts (Dr. Williams and Dr. Brugnoli) and made a strategic decision as to which expert to present at trial.  More importantly, trial counsels' reliance on their retained expert, Dr. Williams, is not unreasonable simply because another expert presented better testimony of essentially and largely the same diagnoses in postconviction proceedings.  This Court has "established that defense counsel is entitled to rely on the evaluations

conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire." <u>Reese v. State</u>, 14 So. 3d 913, 918 (Fla. 2009) (quoting <u>Darling v. State</u>, 966 So. 2d 366, 377 (Fla. 2007)); <u>see also</u> <u>Stewart</u>, 37 So. 3d at 252-53 ("[T]rial counsel's reliance on his retained experts is not proven unreasonable simply because another expert, in this case Dr. Eisenstein, questions the thoroughness of the prior evaluations."). Further, "[t]rial counsel's investigation into mental-health mitigation 'is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.' " <u>Floyd v. State</u>, 18 So. 3d 432, 454 (Fla. 2009) (quoting <u>Asay v. State</u>, 769 So. 2d 974, 986 (Fla. 2000)).

Finally, Johnson did not present any additional non-expert testimony at the evidentiary hearing that was not presented at trial. He presented testimony from Johnson's sister, Danielle Blount Fernandez, who had testified at trial. However, she acknowledged on cross-examination that she did not testify during the evidentiary hearing to anything new or different than what she testified to at trial regarding her and Johnson's background or childhood.

In sum, Dr. Williams testified at trial in a manner consistent with his written reports, including his determination that while Johnson suffered symptoms of PTSD throughout childhood, those symptoms dissipated before Johnson became a teenager. Further, the expert testimony that Johnson presented at the evidentiary

hearing from Dr. Toomer was similar—and therefore largely cumulative—to that of Dr. Williams, with the exception of an affirmative diagnosis of PTSD. Significantly, Dr. Toomer did not rely on any new facts or information not known to Dr. Williams. Finally, although Johnson presented testimony from his sister at the evidentiary hearing, she gave the same testimony as she did at trial. Accordingly, we conclude that Johnson has failed to establish that his trial counsel were deficient with respect to the presentation of mental health mitigation during the penalty phase.

## V. Habeas Corpus Petition

In his habeas corpus petition, Johnson contends that his appellate counsel was ineffective for failing to raise as an issue on direct appeal the trial court's denial of a motion to suppress Johnson's statement to law enforcement in which he confessed to the murder. Specifically, Johnson claims that after he waived his <u>Miranda</u> rights, law enforcement failed to scrupulously honor his unequivocal request to invoke his right to remain silent. He also argues that law enforcement used promises and coercion to induce Johnson to continue being interrogated.

To be entitled to habeas relief on the basis of ineffectiveness of appellate counsel, the defendant must show:

> [First] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to

such a degree as to undermine confidence in the correctness of the result.

Bradley v. State, 33 So. 3d 664, 684 (Fla. 2010) (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)).  In order to meet this standard, the defendant must meet his or her "burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based."  Anderson v. State, 18 So. 3d 501, 520 (Fla. 2009) (quoting Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000)).  Importantly, "[i]f a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective."  Walls v. State, 926 So. 2d 1156, 1175-76 (Fla. 2006) (quoting Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000)).

Johnson's primary contention is that Detective Flaherty failed to scrupulously honor Johnson's termination of the interview as reflected below:

> JOHNSON:  I don't want to say no more.
> DETECTIVE FLAHERTY:  You sure?
> JOHNSON:  Yes.
> DETECTIVE FLAHERTY:  If you're sure, that's your right.
> JOHNSON:  Can I have a cigarette, please?
> DETECTIVE FLAHERTY:  I don't have cigarettes here.  We'll see if I can get one for you.
> JOHNSON:  I know I did not pull a knife on her.

Johnson's statement, "I don't want to say no more" was clearly unequivocal.  See Cuervo v. State, 967 So. 2d 155, 162-63 (Fla. 2007) (holding that defendant's

statement of "No quiero declarar nada," which means "I don't want to declare anything," was "a clear invocation of the right to remain silent"). At that point, "the police officer's obligation was clear: to immediately cease questioning and scrupulously honor [the defendant's] exercise of his right to remain silent." Id. at 164. This Court has explained that

> [a]fter a suspect invokes his or her Miranda rights, police officers are prohibited from engaging in words or actions that the officers "should know are reasonably likely to elicit an incriminating response from the suspect." The prohibition on further questioning applies not only when the defendant requests counsel, but also when the defendant exercises his or her right to remain silent.

Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). This Court has recently elaborated:

> Police fail to scrupulously honor a defendant's invocation of the right to remain silent, and therefore violate that right, when, in the face of the invocation of that right, the police persistently and repeatedly engage in efforts to wear down a suspect's resistance and make the suspect change his or her mind.

Deviney v. State, 112 So. 3d 57, 74 (Fla. 2013) (citing Michigan v. Mosley, 423 U.S. 96, 105-06 (1975)), cert. denied, 134 S. Ct. 518 (2013).

The record in this case demonstrates that Detective Flaherty did not "persistently and repeatedly engage in efforts" to wear down Johnson's resistance and make him change his mind, id., nor did Detective Flaherty engage "in words or actions that [he] 'should know are reasonably likely to elicit an incriminating

- 55 -

response' " from Johnson. <u>Cuervo</u>, 967 So. 2d at 164 (quoting <u>Innis</u>, 446 U.S. at 301).

The facts of this case stand in stark contrast to cases in which this Court has held that law enforcement did not scrupulously honor a defendant's invocation of the right to remain silent. For example, in <u>Cuervo</u>, this Court held that the defendant's unequivocal invocation of his right to remain silent was not scrupulously honored where law enforcement followed the invocation with having the defendant sign a <u>Miranda</u> rights form and informing the defendant that this was his opportunity to speak and explain his side of the story. <u>Id.</u> at 164-67. This Court reasoned:

> [T]he officers engaged in conduct they could reasonably anticipate would elicit an incriminating response. After Cuervo invoked his right to remain silent and signed the rights form, [Detective] Palmieri instructed [Deputy] Garcia to tell Cuervo that he could give "his side of the story." Garcia then told Cuervo, "[N]ow would be your opportunity if you wish to speak and explain your side of your story, your version of what happened." * Garcia added that although Cuervo was not obligated to talk, if he wished to talk "there's still time." * These remarks undermined the warning to Cuervo that <u>anything</u> he said could be used <u>against him</u> in a court of law. In addition, the officer's statement created the impression that, despite his expressed desire not to talk, Cuervo had a brief window in which to vindicate himself. Cuervo again declined to talk, but significantly, he felt compelled to provide an explanation for foregoing this "opportunity" to tell his "side of the story."

Id. at 164-65.  Another contrasting example is Deviney, in which, after the

defendant repeatedly stated, "I'm done," and attempted to end questioning by

leaving the interrogation room,

> [t]he detectives responded by informing him that he was no longer
> free to leave because they were now formally taking him into custody
> and legally detaining him for the murder . . . .  The detectives
> subsequently frisked Deviney, after which he stood and, more
> vehemently, attempted to end questioning by leaving the interview
> room.  The detectives, however, blocked his exit and, with the threat
> of physical restraint, compelled him to sit down and remain in his
> seat.  The detectives did not re-administer Miranda warnings, nor did
> they cease questioning.  Instead, the interrogation continued and, upon
> repeated questioning, Deviney confessed to [the] murder to both the
> police and his mother.

Deviney, 112 So. 3d at 78.

Here, Detective Flaherty asked, "You sure?" and, when Johnson stated,

"Yes," Detective Flaherty responded, "If you're sure, that's your right."  Johnson

then asked for a cigarette and Detective Flaherty responded that he would see if he

could get one for Johnson.  Detective Flaherty did not resume questioning of any

kind or make any statements to Johnson.  It was Johnson who then reinitiated the

interview about the crime on his own, stating "I know I did not pull a knife on

her."  We conclude that the trial court did not err in denying Johnson's motion to

suppress, and appellate counsel was therefore not deficient for failing to raise this meritless issue on direct appeal. Walls, 926 So. 2d at 1175-76.[12]

The record also does not support Johnson's claim that law enforcement made promises to Johnson in exchange for his cooperation. Detective Flaherty informed Johnson prior to his invocation of his right to remain silent that Vitale had already told law enforcement that Johnson committed the murder and that this was Johnson's chance to "help yourself." Johnson then stated: "Help myself, huh? Can I smoke a cigarette?" Detective Flaherty responded: "After we chat." This is the portion of the record that Johnson cites in arguing that Johnson was previously promised a cigarette if he talked to the police. However, the record clearly shows that Johnson was not promised a cigarette in exchange for confessing or speaking with the police. We also note that both detectives who interrogated Johnson testified that they did not make any promises to Johnson in exchange for his cooperation and that they did not coerce or intimidate him in any way.

---

12. Johnson raises some additional arguments for the first time in his Reply Brief, including that Johnson "tripped" while being handcuffed by Detective Griffith and that Detective Flaherty's conduct was intimidating because he maintained "close proximity" to Johnson throughout the interview. Because these arguments are raised for the first time in Johnson's Reply Brief, they are barred. See Hoskins, 75 So. 3d at 257. Further, the record does not contain any indication that Johnson was purposefully "tripped" while being handcuffed or that Detective Flaherty's conduct was intimidating.

Regardless of whether the portion of the interview after Johnson stated that he did not want to say "no more" should have been suppressed, any error would have clearly been harmless beyond a reasonable doubt. See Deviney, 112 So. 3d at 79 ("Miranda violations are subject to a harmless error analysis."). Johnson argues that the error cannot be harmless because without his confession, "the [S]tate's evidence would have relied almost exclusively" on Vitale's testimony and "[w]ithout Mr. Johnson's confession, the [S]tate's case became threadbare and the result on trial would have been different." However, Johnson overlooks that he confessed to killing the victim before he invoked his right to remain silent. Johnson then made similar statements afterwards.

Johnson denied mutilating the victim's body both before and after the invocation of his right to remain silent. Moreover, the additional information elicited after the invocation of the right to remain silent consisted of additional details of what transpired the evening and morning before the victim was killed, as well as Johnson's statements about his efforts to dispose of the body. This additional information, however, was also provided by extensive testimony introduced at trial, which largely corroborated Vitale's testimony as to these details. Appellate counsel cannot be deficient for failing to raise a meritless claim on direct appeal. See Rutherford, 774 So. 2d at 643. Thus, Johnson is not entitled to relief on this claim.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's denial of relief,

and we also deny Johnson's habeas petition.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for St. Lucie County,
    Dwight Luther Geiger, Judge - Case No. 562001CF000793A

And an Original Proceeding – Habeas Corpus

Craig J. Trocino, Special Assistant, and Scott Gavin, Staff Attorney, CCRC-South, Fort Lauderdale, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Lisa-Marie Lerner, Assistant Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Respondent